UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL


UNITED STATES OF AMERICA,          )
                                   ) 1:16-cr-171  LJO-SKO
          Plaintiff,               )
                                   ) JURY TRIAL, DAY 2
     vs.                           )
                                   )
COLIN LOVETTE BOSBY,               )
                                   ) Vol. 2, pgs. 224 To 354,
          Defendant.               ) inclusive.
_____)

Fresno, California                 Wednesday, August 2, 2017



REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES OF COUNSEL**:

For the Government:          **MEGAN A.S. RICHARDS**
                             **VINCENZA RABENN**
                             Assistant U.S. Attorneys
                             2500 Tulare Street, Rm. 4401
                             Fresno, California  93721

For the Defendant:           LAW OFFICES OF GARY HUSS
                             5490 East Liberty Avenue
                             Fresno, CA 93727
                             BY:  **GARY L. HUSS**




REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

225

## INDEX

**GOVERNMENT'S WITNESSES**:

**MICHAEL TUMBIOLO**                                      227
FURTHER DIRECT EXAMINATION BY MS. RICHARDS               228
CROSS-EXAMINATION BY MR. HUSS                            285
REDIRECT EXAMINATION BY MS. RICHARDS                     339

**ERIC BRELSFORD**                                        343
DIRECT EXAMINATION BY MS. RABENN                         343
CROSS-EXAMINATION BY MR. HUSS                            348

## EXHIBITS

**GOVERNMENT'S**                                      Received
 31                                                      236
 32                                                      237
 33                                                      241
 35                                                      243
 36, 37, 38, 39 and 41                                   245
 40                                                      249
 42                                                      251
 43                                                      253
 44                                                      256
 45                                                      258
 46                                                      261
 54                                                      263
 49                                                      266
 47                                                      267
 48                                                      269
 51                                                      273
 52                                                      274
 50                                                      277
 55                                                      277
 53                                                      279
 56                                                      280
 34                                                      299

226

1   Wednesday, August 2, 2017                  Fresno, California

2   8:30 a.m.

3       (The following proceedings were had outside the presence

4        of the jury, to wit:)

5           THE COURT:  Back on the record.  Counsel are present.

6   The defendant is present.

7           Are we ready for the jury?

8           MR. HUSS:  Yes, your Honor.

9           MS. RICHARDS:  We have one legal issue to take care

10  of.

11          THE COURT:  What is it?

12          MS. RABENN:  Yes, your Honor.  The last page of the

13  order on our motion in limine for the 404(b)/414 evidence, it

14  allows us to bring in the conduct underlying the 2004

15  conviction.  However, it references 404(b) instead of 414.  It

16  says:

17          "The evidence of the conduct that resulted in the 2004

18           conviction may be admissible for FRE 404(b)

19           purposes."

20          In our motion, we believe that the conduct is also

21  admissible for 414 purposes; in other words, that it is

22  admissible as propensity evidence and not just for 404(b)

23  purposes.

24          So we were hoping for a clarification that we could,

25  in our closing argument, argue it as 414 evidence instead of

1  just 404(b).

2       THE COURT:  I will tell you in looking at my order,

3  including, but not limited to, the title, it was intended to

4  include 414.

5       MS. RABENN:  Thank you, your Honor.

6       THE COURT:  All right.  We are ready for the jury.

7       Is the witness ready?

8       MS. RICHARDS:  Yes, he is.  He is right outside the

9  door.

10      THE COURT:  Why don't we bring him in and have him

11 take the stand.

12      MS. RICHARDS:  He is coming right in.

13   (The following proceedings were had in the presence of the

14     jury, to wit:)

15      THE COURT:  All right.  Still on the record, and the

16 jury has joined us.

17      Good morning, ladies and gentlemen.  Any issues, any

18 concerns?  No.  Okay.

19      Witness is back on the stand.  We will continue and

20 finish with direct examination.

21               **MICHAEL TUMBIOLO**,

22 called as a witness on behalf of the Government, having been

23 previously sworn, testified as follows:

24 ///

25 ///

MICHAEL - TUMBIOLO - D

228

1        FURTHER DIRECT EXAMINATION

2   BY MS. RICHARDS:

3   Q.  Good morning, Special Agent Tumbiolo.  When we finished

4   yesterday, you had just gone through your PowerPoint

5   presentation describing generally how computers work.

6          So now I want to move over to your involvement in

7   this case against the defendant, Colin Bosby.

8          You previously testified that you analyzed Exhibits 1

9   through 3 in this case.  And they are sitting right here.

10  Exhibit 1, the eMachine computer; Exhibit 2, the PNY flash

11  drive; and Exhibit 3, the Lexar flash drive or thumb drive.

12         I think you testified a flash drive and thumb drive

13  are the same thing.

14  A.  Yes.

15  Q.  Approximately -- well, first, were you actually present

16  when these devices were seized?

17  A.  I was not present when they were seized.

18  Q.  Approximately when did you become involved in this case?

19  A.  Approximately June 15th.

20  Q.  Of this year?

21  A.  Of this year, 2017.

22  Q.  What was the scope of your involvement?

23  A.  A request was put in by AUSA Richards to perform a

24  forensics analysis of these items.  And so these items were

25  received in our HSI Fresno office, specifically, in my secure

1  forensics lab for review.

2  **Q.**  And did you conduct a full forensic examination of

3  Exhibits 1 through 3?

4  **A.**  Yes, I did.

5  **Q.**  I'm going to ask you some questions about the forensic

6  procedure that you followed.  Did you follow a forensic

7  procedure that you have been taught to follow in your forensic

8  classes?

9  **A.**  Yes.

10  **Q.**  When you first took custody of these three items, what did

11  you do?

12  **A.**  The very first thing, when you take custody, is to sign a

13  chain of custody form.

14  **Q.**  Okay.  And then after you do that, what do you do with the

15  actual devices?

16  **A.**  Once I have the evidence device, I then would remove the

17  hard drive; for example, from the eMachine.  I would take that

18  hard drive, and, again, plug it into what's called a Tableau

19  Read-Write Blocker.

20         And what that does is it stops me from writing

21  anything to whatever evidence item I plug into it.  It is a

22  physical piece of hardware that I plug the eMachine hard drive

23  into, and then I plug the write blocker into my computer to

24  capture a bit-by-bit image of the original evidence device.

25  **Q.**  When you talk about write, is that spelled w-r-i-t-e?

MICHAEL - TUMBIOLO - Q

230

1   **A.**   That's correct, "write."

2   **Q.**   Can you describe what you mean by writing to a device?

3   **A.**   Yes.  The reason for putting the write blocker on is that

4   I then take a generic text file and I attempt to save it or

5   write it to the original evidence device through the write

6   blocker.

7           And at that point, it says, "Permission access

8   denied," which means I cannot take that file and write it to

9   the original evidence device.

10  **Q.**   When you talk about writing a file to the original

11  evidence device, are you referring to saving a file or

12  changing the device in some way?

13  **A.**   Yes.  "Writing to" would be the same as saving to a device

14  or changing what is the content of that device.

15  **Q.**   And so that the write blocker you are talking about, does

16  that prevent you from making any changes to the original

17  evidence item?

18  **A.**   Absolutely.

19  **Q.**   And once you've attached the write blocker so that you

20  don't make any changes to the original evidence item, what do

21  you do?

22  **A.**   Again, I try to take a -- or I take a text file and I try

23  to save that text file to the device to be a hundred percent

24  sure my write blocker device is working accurately.  On the

25  hardware write blocker, I have never had it not work

1    accurately.

2          From that point, I use a program called "FTK Imager."

3    And the FTK Imager then creates a bit-by-bit image of the

4    original evidence device; essentially, a duplicate copy of the

5    original evidence device.

6    **Q.**  After you have made a bit-for-bit copy, what do you do

7    next?

8    **A.**  At that point, I verify that the MD5 and SHA-1 values

9    match up, and if the FTK Imager does complete correctly, then

10   the bit-by-bit copy of the original evidence device does have

11   an accurate MD5 and SHA-1, S-H-A-1 value.

12   **Q.**  Did you talk about MD5 and SHA-1, S-H-A or SHA values

13   yesterday?

14   **A.**  Yes, I did.

15   **Q.**  Was that the long number in the PowerPoint presentation?

16   **A.**  Yes.  Those are the 32-bit and 40-bit strings of numbers

17   you see, numbers and characters.

18   **Q.**  In this case, after you made bit-for-bit copies of these

19   three items, did you verify them by looking at the hash

20   values?

21   **A.**  Yes, I did.

22   **Q.**  Did they match?

23   **A.**  They matched.

24   **Q.**  All right.  And so after verifying that values match when

25   you are doing a forensic exam, what do you do next?

1  **A.**  Once I have taken that image or bit-by-bit copy and pull

2  it into the FTK software, I then process that image.  And by

3  "process," I pull that image in and the FTK software processes

4  that image for all files and folder structures that exist on

5  that image.

6          And then I also carve that item, and what I mean by

7  "carving," carving is simply the process of recovering deleted

8  content.

9          So if you or I were to delete a file -- and again, it

10  is not in the -- if you remember in the PowerPoint, there is

11  no card in the card file, but the book still exists on the

12  shelf.  If I try to carve a hard drive, it simply goes through

13  and actually looks for the files out on the hard drive and

14  recovers what it can from each file.

15  **Q.**  During this process, are you able to recover all deleted

16  files?

17  **A.**  No.

18  **Q.**  What are some circumstances that would result in you not

19  being able to recover a deleted file?

20  **A.**  If a file is overwritten by another file, then that new

21  information has taken the spot on the hard drive.  I would not

22  be able to recover it.

23          If the file is deleted with some form of wiping

24  software, I would not be able to recover it.

25  **Q.**  Once you've had your bit-for-bit copy, and you have carved

1   it with Forensic Toolkit, what did you do with the original

2   item, so Exhibits 1 through 3; what do you do with those?

3   A.   The original evidence is returned back to its bag or its

4   computer tower.

5   Q.   If the bit-by-bit copies were somehow damaged or

6   destroyed, could you go back to the original device and redo

7   the process?

8   A.   Yes.

9   Q.   Did you have to do that in this case?

10  A.   No.

11  Q.   In addition to Forensic Toolkit, did you use any other

12  forensic software to analyze the computer and thumb drives?

13  A.   Yes.  I used a program called "IEF," which stands for

14  "Internet Evidence Finder."

15  Q.   Does that work in a similar way to Forensic Toolkit?

16  A.   Yes.

17  Q.   I'm going to ask you now about your forensic findings.  We

18  will start with the eMachine desktop computer, so Exhibit 1.

19          What was the first step you took when you had an

20  exact copy of Exhibit 1 and you had loaded it into FTK and you

21  had carved it out?  What did you look for?

22  A.   So the first step is to look for the who, the what, the

23  when, the where, and possibly why, if possible.

24  Q.   When you say "look for the who," what do you mean?

25  A.   The "who" would be who is using this computer the most.

1   **Q.**   What would the "what" be?

2   **A.**   The "what" is looking for content that is of criminal

3   nature.

4   **Q.**   Okay.  And when you say "when," what do you mean?

5   **A.**   The "when" would be, if you remember the metadata I talked

6   about, the "when" would be the timestamps on the files.

7   **Q.**   When you are looking at files in a child pornography case

8   such as this one, what type of files do you look at?

9   **A.**   I am specifically looking for images or videos that depict

10  minors performing sexual acts or posed in sexual nature.

11  **Q.**   Do you also look for evidence of who has been using the

12  computer?

13  **A.**   Yes.  I look for evidence of who is using the computer,

14  and then I also look for general information, such as system

15  information, meaning what operating system is installed and

16  what devices may have been plugged into that operating system.

17  **Q.**   When you conducted your examination of Exhibit 1, did you

18  take screen captures of what you saw?

19  **A.**   Yes, I did.

20  **Q.**   Did you use FTK in order to determine what operating

21  system this computer had?

22  **A.**   Yes.

23  **Q.**   Can we please show Exhibit 31.  Do you recognize Exhibit

24  31?

25  **A.**   Yes.

1  **Q.**  Who prepared this exhibit?

2  **A.**  I prepared this exhibit.

3  **Q.**  What is it?

4  **A.**  This is the software.dat file pulled from the registry.

5  The registry on a computer is something that normal users

6  would not see, but the registry is the database for the

7  operating system that stores all the information and control

8  values for applications and the operating system itself.  So

9  this particular software.dat file --

10       MS. RICHARDS:  Let me stop you there.  United States

11  moves to admit Exhibit 31.

12       MR. HUSS:  I would like to hear further foundation.

13       MS. RICHARDS:  Okay.

14       THE WITNESS:  Yes.  This exhibit, in particular,

15  shows the operating system that was installed and the

16  installation date.  The operating system was installed on the

17  eMachine.

18  BY MS. RICHARDS:

19  **Q.**  And is this a screen shot?

20  **A.**  This is not a screen shot.  This file is actually part of

21  my FTK report.

22       MS. RICHARDS:  The United States moves to admit

23  Exhibit 31.

24       THE COURT:  Any objection?

25       MR. HUSS:  Lack of foundation.

MICHAEL TUMBIOLO - D

236

1        THE COURT:  What is, in your view, missing?

2        MR. HUSS:  This appears to be something he created,

3   and --

4        THE COURT:  That's why the foundation has been laid.

5        MR. HUSS:  Oh.  Then I will submit it.

6        THE COURT:  Objection is overruled.  It is received.

7     (Government's Exhibit 31 was received.)

8   BY MS. RICHARDS:

9   Q.  Can we please zoom into the top half of this.

10       Special Agent Tumbiolo, what operating system was

11  installed on the eMachine computer?

12  A.  The Windows Vista Home Premium, with Service Pack 1.

13  Q.  I want to remind you you can use your finger -- I'm not

14  saying you need to -- with any of these exhibits, but it looks

15  like you know how.

16       Okay.  Did you determine the software's installation

17  date?

18  A.  Yes.

19  Q.  When was the software installed?

20  A.  The software was installed August 21st, 2013.

21  Q.  Does the Windows Vista operating system organize data on a

22  computer?

23  A.  Yes.

24  Q.  And how does it organize that data?

25  A.  That data is organized in a file folder and sub folder

1    structure.

2    Q.  Did you look at the folder and sub folder structure with

3    FTK?

4    A.  Yes.

5    Q.  Can we please show Exhibit 31 for identification -- sorry.

6    Exhibit 32.

7         Special Agent Tumbiolo, what is Exhibit 32?

8    A.  Exhibit 32 is the file -- I'm sorry -- the folder and sub

9    folder structure of the eMachine.  And this is a screen

10   capture from the FTK software.

11   Q.  Did you prepare this exhibit?

12   A.  Yes.

13   Q.  What was your purpose in analyzing this information?

14   A.  This folder and sub folder structure shows the actual user

15   accounts and, specifically, the Ares Share Folder that

16   would -- that was designated for the Ares program for file

17   sharing for files that were downloaded and then able to be

18   shared back out to other Ares users.

19        MS. RICHARDS:  Your Honor, the United States moves to

20   admit Exhibit 32.

21        MR. HUSS:  No objection.

22        THE COURT:  Received.

23     (Government's Exhibit 32 was received.)

24   BY MS. RICHARDS:

25   Q.  All right.  Can we zoom into the top half of Exhibit 32,

1    please.  Special Agent Tumbiolo, can you describe this folder

2    and sub folder structure, starting with the top folders?

3    A.  Yes.  In this instance, the root would be the standard C

4    drive that you and I would see if we went to our computer.  So

5    any time you see "Root," that is the very first beginning of

6    this drive or volume.

7          So the root in this example would be the C drive.

8    Underneath the C drive, expanded out, you can see all the

9    standard folders that you and I would usually see, such as

10   Documents and Settings, Downloads, Program Files, and then the

11   Users Folder.

12   Q.  What users did you see on this computer?

13   A.  Specifically, under the Users Folder, I saw Programs,

14   Internet, and the Smiley2.

15   Q.  Was there a folder where most of the relevant items -- let

16   me rephrase that.

17          Was there a user name where you found most of the

18   relevant evidence items in this case?

19   A.  Yes.  The user name was "Internet."

20          MS. RICHARDS:  Can we zoom back out, please.  Can you

21   re-zoom now into the bottom half of this exhibit.

22   BY MS. RICHARDS:

23   Q.  Did you see evidence of any peer-to-peer file sharing

24   programs in this folder and sub folder structure?

25   A.  Yes.  Under the user "Internet," it is expanded out, and

1    you have again your default folders, My Documents, Pictures,

2    and then Saved Games.

3           Under Saved Games, we have a folder labeled "Ares,"

4    and that is where I found the content.

5    **Q.**  As a computer -- as a person who examines computers and

6    investigates peer-to-peer file sharing, are you familiar with

7    where Ares would usually install a saved folder?

8    **A.**  Yes.  The shared folder for Ares by default is not in this

9    location.

10   **Q.**  Where is the default location for Ares usually?

11   **A.**  Usually, it would be in a path up, in the Application

12   Data.

13   **Q.**  How would the Ares folder become saved under Saved Games?

14   **A.**  The user of the Ares program would have to physically go

15   into the control settings of the Ares program and specify the

16   folder be under this location.

17          THE COURT:  Counsel, my screen is not working for

18   some reason.  We have called technology.  So I'm going to step

19   over to a different screen; that's why I'm going to leave the

20   bench for just a moment, but if there is an objection, I will

21   certainly hear it.

22          MS. RICHARDS:  No objection from the government.

23   Thank you, your Honor.

24          THE COURT:  Okay.

25   ///

MICHAEL TUMBIOLO - D

240

1    BY MS. RICHARDS:

2    **Q.**  Did you look in the Ares shared folder?

3    **A.**  Yes, I did.

4    **Q.**  Did you see any images that appeared to be of children

5    engaged in sex acts in that folder?

6    **A.**  There were videos.

7    **Q.**  Did you look for -- did you look for any evidence to show

8    when Ares was installed on this computer?

9    **A.**  Yes.

10   **Q.**  Can we please show Government's Exhibit 33.  What is

11   Government's Exhibit 33?

12   **A.**  This is a screen capture from FTK of the application Ares

13   and the properties associated to the application Ares.

14   **Q.**  Did you create this exhibit?

15   **A.**  Yes.

16   **Q.**  And how did you create it?

17   **A.**  Using the screen capture in FTK.

18   **Q.**  What was your purpose in analyzing this information?

19   **A.**  One, to show that Ares was installed, and also to show the

20   installation date of Ares.

21          MS. RICHARDS:  Your Honor, the United States moves to

22   admit Government's Exhibit 33.

23          THE COURT:  Any objection?

24          MR. HUSS:  No, your Honor.

25          THE COURT:  It is received.

241

1        (Government's Exhibit 33 was received.)

2    BY MS. RICHARDS:

3    **Q.**  Special Agent Tumbiolo, when was Ares installed on the

4    computer?

5    **A.**  So under the File Dates, right here, we see February 4th

6    of 2015.

7    **Q.**  Did you check the computer to see if there was any virus

8    scanning software present on it?

9    **A.**  Yes.

10   **Q.**  Did you see evidence of virus scanning software?

11   **A.**  Yes.

12   **Q.**  What virus scanning software did you see present on the

13   computer?

14   **A.**  AVG, which is a free, downloadable antivirus software.

15   And there were three different years downloaded to the

16   computer, 2012, 2013, and 2015.

17   **Q.**  Did you take any steps during your examination to see if

18   there were any viruses or malware on the computer?

19   **A.**  Yes, I took the original image, the bit-by-bit copy that I

20   created, and I scanned it with an antivirus software.

21   **Q.**  Did you find any viruses or malware present on the

22   computer?

23   **A.**  No.

24   **Q.**  Did you look for evidence of who might have used the

25   computer?

1   A.  Yes.

2   Q.  When you are looking for evidence of who might have used

3   the computer, what sort of documents do you look for?

4   A.  Any type of documents or pictures or access to bank

5   accounts or bank statements, anything related to who may be

6   using this computer.

7   Q.  Based on what you saw, did you come to any conclusions

8   about who was the primary user of the computer?

9   A.  Yes.

10  Q.  Who did you conclude was the primary user of the computer?

11  A.  I concluded Colin Bosby as the primary user.

12  Q.  Did you see documents for anybody else on the computer?

13  A.  Yes.

14  Q.  Okay.  Was there one person or more than one person in

15  particular in addition to Colin Bosby that you saw documents

16  for?

17  A.  Yes.

18  Q.  What was that person's name?

19  A.  Ann Johnston.

20       MS. RICHARDS:  Can we please show Government's

21  Exhibit 35.

22  BY MS. RICHARDS:

23  Q.  Special Agent Tumbiolo, do you recognize this exhibit?

24  A.  Yes.

25  Q.  And who prepared this?

1  A.  I prepared this with the FTK report.

2  Q.  What does this show?

3  A.  This exhibit shows the different files that I bookmarked

4  for explanation of who may be using this computer.

5  Q.  Okay.  What was your purpose in analyzing this

6  information?

7  A.  I believe each of these documents show who is the primary

8  user of this computer.

9  Q.  Does this document also show metadata for these documents?

10  A.  Yes.

11      MS. RICHARDS:  Your Honor, the United States moves to

12  admit Exhibit 35.

13      MR. HUSS:  No objection to 35.

14      THE COURT:  It is received.

15   (Government's Exhibit 35 was received.)

16  BY MS. RICHARDS:

17  Q.  All right.  Can we now -- we are going to talk about

18  Government's Exhibit 35 in a moment.

19      Can I have you look at Exhibits 36, 37 -- and if you

20  want to look at them in the binder in front of you, that might

21  be easier.  If you could look at Government's Exhibits 36, 37,

22  38, 39 and 41 in the binder in front of you.

23  A.  (Witness Complies.)

24  Q.  Do you recognize those five exhibits?

25  A.  Yes, I do.

1    **Q.**  Did you prepare those exhibits?

2    **A.**  Yes, I did.

3    **Q.**  What are they?

4    **A.**  These are the actual documents that you see in this list.

5    **Q.**  Okay.  Is it five of the documents from this list?

6    **A.**  Yes.

7    **Q.**  Why don't you just flip through them briefly and give a

8    really brief description of each one.  So starting with

9    Exhibit 36.

10   **A.**  Exhibit 36 -- would you like the file name, or no?

11   **Q.**  No.  We will get to that.  Just in a few words.

12   **A.**  Exhibit 36 is a California driver's license.

13            THE COURT:  Whose?

14            THE WITNESS:  California driver's license for a Colin

15   L. Bosby, with a date of birth of 03/06/1967.

16   BY MS. RICHARDS:

17   **Q.**  What is Exhibit 37?

18   **A.**  Exhibit 37 is a vehicle registration.  And on the vehicle

19   registration, it shows a Colin L. Bosby, also Ann Lynn

20   Johnston, with an address of 1717 Baker Street, Apartment A,

21   and also a P.O. Box of 362, Bakersfield, California.

22   **Q.**  What is Exhibit 38?

23   **A.**  Exhibit 38 is a voided check for a Colin L. Bosby, at 1717

24   Baker Street, Apartment A, Bakersfield, California, and also a

25   California driver's license for a Colin L. Bosby.

1   **Q.**  And Exhibit 39?

2   **A.**  Exhibit 39 is a auto insurance quote.  And it is signed by

3   a Colin L. Bosby, and appears to have been mailed to a Colin

4   L. Bosby, at P.O. Box 362, Bakersfield.

5   **Q.**  And lastly, what is Exhibit 41?

6   **A.**  Exhibit 41 is a Wells Fargo Bank account statement, and it

7   shows a "Smiley's Checking" as the title of that account.

8   **Q.**  And were each of these documents found on the eMachine

9   computer?

10   **A.**  Yes, they were.

11   **Q.**  And --

12       Your Honor, the United States moves to admit

13   Government's Exhibits 36, 37, 38, 39, and 41.

14       MR. HUSS:  No objection.

15       THE COURT:  Received, all.

16   (Government's Exhibits 36, 37, 38, 39 and 41 were

17    received.)

18       MS. RICHARDS:  Can we please bring up on the

19   left-hand side of the screen, Government's Exhibit 35, and on

20   the right-hand side of the screen, Government's Exhibit 36.

21   BY MS. RICHARDS:

22   **Q.**  Okay.  So what are we looking at on the right-hand side of

23   the screen?

24   **A.**  Exhibit 36 is the California driver's license, and it is

25   for Colin L. Bosby, with a date of birth of 03/06/1967.

1    **Q.**   And does this document appear on the list in Government's

2    Exhibit 35?

3    **A.**   Yes, it does.

4    **Q.**   Okay.  Can you show us where it appears on this list?

5    **A.**   Yes.  Can you minimize the license, please.

6    **Q.**   Let us know if we need to go to the next page.

7    **A.**   It is on page 2, I believe.  So right here, under the

8    Root/Users/Internet/Documents folder, we have the document

9    named "drivers lic-smiley.pdf," and that is Exhibit 36.

10   **Q.**   And when was this file created on the computer?

11   **A.**   The file was created July 20th, 2015.

12   **Q.**   On the right-hand side, can you please bring up

13   Government's Exhibit 37.  Is this another document that you

14   saw on the computer?

15   **A.**   Yes.

16   **Q.**   Did you determine approximately when this document was

17   downloaded to the computer?

18   **A.**   Yes.

19   **Q.**   When was that?

20   **A.**   I believe this to be the car registration, and this item

21   was saved August 16th, 2015.

22   **Q.**   And now let's look at Government's Exhibit 38, on the

23   right-hand side.  What is this exhibit?

24   **A.**   This is a voided check and a California driver's license.

25   The voided check is showing a name of Colin L. Bosby, at 1717

1   Baker Street, Apartment A, Bakersfield, California.

2           The bottom part of the picture is a California

3   driver's license, that of Colin L. Bosby, with a date of birth

4   of 03/06/1967, and an address -- if you could zoom into the

5   driver's license -- the address is a P.O. box, P.O. Box 362,

6   Bakersfield, California.

7   Q.  Can we zoom back out so we can see the exhibit on the left

8   of the screen, which is Government's Exhibit 35?

9           Do you see on Government's Exhibit 35 the download

10  date for this voided check and driver's license?

11  A.  Yes.

12  Q.  What is that date?

13  A.  The created date is down here at the very bottom.  It is

14  going to be May 29, 2015.

15  Q.  Can we please bring up Government's Exhibit 39 on the

16  right-hand side.

17          What is this document?

18  A.  This is a auto insurance quote sent to a Colin L. Bosby.

19  Q.  What's the date on this document?

20  A.  It is on the previous page.

21  Q.  Sorry.  Let me retract my question.

22          What was the download date for this document, on

23  Government's Exhibit 35?

24  A.  On Exhibit 35, could you go to the previous page?  It is

25  at the very top right here.  But the date information would be

1    on the previous page.

2    **Q.**   Can you see it now?

3    **A.**   Yes.   The created date is June 27, 2016.

4    **Q.**   Okay.   And lastly, can we please bring up Government's

5    Exhibit 41, on the right-hand side.   What is this?

6    **A.**   This is a Wells Fargo online bank statement.

7    **Q.**   What was the download -- well, who is this bank statement

8    for?

9    **A.**   Up here, it says, "Smiley's Checking."

10   **Q.**   And do you see any names within the bank statement that

11   refer to any -- any that refer to Mr. Bosby?

12   **A.**   Yes.   Down here near the bottom, you see Colin L. Bosby.

13   **Q.**   Did you see other examples of banking documents for

14   Mr. Bosby on this computer as well?

15   **A.**   Yes.

16   **Q.**   And what was the download date for this particular

17   document?

18   **A.**   This particular document is January 2nd, 2015.

19   **Q.**   Let me turn your attention now to Government's Exhibit 40.

20   Do you recognize this document?

21   **A.**   Yes.

22   **Q.**   Who prepared this exhibit?

23   **A.**   I did.

24   **Q.**   Why did you prepare it?

25   **A.**   This is a -- just a screen capture of the document, "med

1    list--smiley-7-17-16.doc."

2    **Q.**  Why did you prepare this sheet?

3    **A.**  When you open this document, it is a medical list of

4    medicine taken.

5    **Q.**  Did it appear to be for the defendant?

6    **A.**  Yes.

7         MS. RICHARDS:  Government moves to admit Government's

8    Exhibit 40.

9         THE COURT:  Any objection?

10        MR. HUSS:  No, your Honor.

11        THE COURT:  Received.

12    (Government's Exhibit 40 was received.)

13   BY MS. RICHARDS:

14   **Q.**  Is this the actual document that was on the computer?

15   **A.**  No.  This is the file path to that document.

16   **Q.**  Did you see other lists of medicine on the computer?

17   **A.**  Yes.

18   **Q.**  For the defendant?

19   **A.**  No.

20   **Q.**  Who were the other lists for?

21   **A.**  One was for Ann Johnston, I believe.

22   **Q.**  This document says "smiley" in the name.  Do you recall

23   seeing "smiley" other places during your examination?

24   **A.**  Yes.

25   **Q.**  Where?

250

1  **A.**   Specifically, the Wells Fargo Bank statement we just saw.

2  And then the California driver's license was actually saved

3  with the name, "drivers lic-smiley."

4          And then also this document was saved under the

5  "Users/Internet/Documents" folder, "Internet" being the user

6  account that was logged in at this time this document was

7  saved there.

8  **Q.**   Did you look at anything else on the computer that would

9  help you to determine who regularly used the computer?

10 **A.**   Yes.

11 **Q.**   What did you look at?

12 **A.**   I looked at USB devices plugged into it.

13 **Q.**   Did you also look at saved logons?

14 **A.**   Yes, I also looked at web page saved logons.

15 **Q.**   What does that refer to?

16 **A.**   Saved logons, for example, if you open up Google Chrome

17 web browser to go to the Internet, and let's say you go to

18 your bank account or your bank web site, when you log into

19 your bank web site, it has to have a user name and password

20 for security reasons.  When you put your user name and

21 password, you will oftentimes notice that Google Chrome will

22 say, "Would you like to store this information," so you don't

23 have to repeatedly put it in.  So that is stored account

24 information.

25          So if you say, "Yes," Google will create a list of

MICHAEL TUMBIOLO - D

251

1    all of those user names and passwords so that you and I don't

2    have to constantly type that information in.

3    **Q.**  Can we please show Government's Exhibit 42.

4          MR. HUSS:  No objection.

5    BY MS. RICHARDS:

6    **Q.**  Does Government's Exhibit 42 show the saved logons that

7    you saw on the computer?

8    **A.**  Yes.  This is the screen capture of the saved logons for

9    Google Chrome.

10         MS. RICHARDS:  Your Honor, the United States moves to

11   admit Government's Exhibit 42.

12         MR. HUSS:  No objection.

13         THE COURT:  Received.

14      (Government's Exhibit 42 was received.)

15   BY MS. RICHARDS:

16   **Q.**  What e-mail addresses did you see most used to log on on

17   this computer?

18   **A.**  The primary account used to logon would be the

19   clbsmiley67@gmail.com.

20   **Q.**  Let me turn your attention now to peer-to-peer file

21   sharing programs.  You previously testified that the Ares file

22   sharing program was installed on the computer.

23         Were you able to capture any search terms for that

24   program?

25   **A.**  Yes.

1    **Q.**  Can you remind the jury what a search term is in the

2    context of Ares?

3    **A.**  So when we open up Ares, we have a tab just for searching

4    content on other Ares computers.  And so, again, we have that

5    search bar that you type in whatever you are looking for, and

6    then once you hit "search," it, again, goes to all the other

7    Ares peer-to-peer computers that are connected to you and on

8    and on out, until it finds what you are looking for.

9          So the search term would be -- again, we used "Elvis"

10   yesterday.  If I type in "Elvis" and I hit "search," it will

11   go to all the Ares computers and return any file or file with

12   metadata containing that word "Elvis."

13   **Q.**  Did you look at the search terms that were used on the

14   version of Ares file sharing that was on Exhibit 1?

15   **A.**  Yes.  I used Internet Evidence Finder, the forensic

16   software, to look for the search terms.

17   **Q.**  Let me turn your attention to Exhibit 43.  What is Exhibit

18   43?

19   **A.**  Exhibit 43 is a screen capture of the IEF forensic

20   software; specifically, the search results for the eMachine.

21   And this shows the Ares search key words.

22   **Q.**  Did you prepare this exhibit?

23   **A.**  Yes.

24   **Q.**  And you testified you prepared it using your forensic

25   software?

1    **A.**   Yes.

2           MS. RICHARDS:  Your Honor, the United States moves to

3    admit Government's Exhibit 43.

4           MR. HUSS:  No objection.

5           THE COURT:  Received.

6       (Government's Exhibit 43 was received.)

7    BY MS. RICHARDS:

8    **Q.**   So we are looking at the first page of Government's

9    Exhibit 43.  Can you please look in the left-hand column.  You

10   have a box highlighted in blue.  What does that say?

11   **A.**   That is the Ares Search Keywords.

12   **Q.**   And is that what we are looking at here?

13   **A.**   Yes.

14   **Q.**   Did you see any keywords that had been used on the

15   computer that were indicative of child pornography?

16   **A.**   Yes.

17   **Q.**   Okay.  Do some of the keywords repeat themselves on this

18   file -- sorry -- in this screen shot?

19   **A.**   Yes, if they are searched more than once.

20   **Q.**   Okay.  So would there be an entry -- would each entry

21   correspond to somebody typing that into the search bar in

22   Ares?

23   **A.**   Yes.

24   **Q.**   Okay.  I would like to go through the -- each page of this

25   exhibit in order.  And I want you to point out any keywords

1   that you saw that were indicative of searches for child

2   pornography.

3   A.   Of course.

4   Q.   Okay.  So starting with page 1, what did you see on this

5   page that is indicative of a search for child pornography?

6   A.   Could you expand this area right here?

7   Q.   Can we expand the area of the search terms?

8   A.   Perfect.  So this column shows the search terms.  And in

9   this exhibit page, we see "2yo" multiple times and "3yo"

10  multiple times and the "yo" stands for "years old," in my

11  experience.

12  Q.   Can we please go to the next page of this exhibit.  Are

13  there any search terms on this page that you thought indicated

14  searches for child pornography?

15  A.   Yes.  In this example, we see more of the "3yo" and then

16  "4yo" and then "5yo."

17  Q.   Go to the third page.

18  A.   This page shows the "5yo" and "6yo."  Again, "yo" stands

19  for "years old."

20  Q.   And the next page?

21  A.   This shows more "6yo," and then "7yo," "8yo."

22  Q.   And the next page?

23  A.   This shows "8yo," "9yo," "10yo."

24  Q.   All right.  And the next page?

25  A.   This shows the search term "hussyfan," which is a common

1  term associated with child pornography.

2  **Q.**  Are the other keywords on that page associated with child

3  pornography, as far as you know?  Can we go back to the

4  previous page?  It says "hot rod lincoln," and that is the

5  search term above "hussyfan".  Is that related to child

6  pornography, as far as you know?

7  **A.**  No.  Nor is "I ain't goin to bump no more with no."

8  **Q.**  Can we go to the next page, please.  Are there any

9  keywords on this page that you associated with child

10  pornography based on your investigations into child

11  pornography?

12  **A.**  Yes.  "Kinderficker," which is in there, and then also

13  "kinderkutje" are very known search terms associated with

14  child pornography.

15  **Q.**  I think there is one more page of this exhibit.

16  **A.**  This page shows "pthc," which stands for "preteen hard

17  core," and also "ptsc," which stands for "preteen soft core,"

18  and these are very common search terms in relation to child

19  pornography.

20  **Q.**  Approximately how many times was "pthc" typed into the

21  Ares search bar on this computer?

22  **A.**  Approximately 16 times.

23  **Q.**  Let me turn your attention to Government's Exhibit 44.

24  Were you able to identify any files that had actually been

25  downloaded by the Ares peer-to-peer file sharing program?

1  **A.**  Yes.

2  **Q.**  So you are looking now on the Government's Exhibit 44.

3  What does this exhibit show?

4  **A.**  So just like the Google Chrome can track your passwords

5  and user names, Ares, the Ares program creates a file called

6  "share 1.dat," and that file tracks all the files you download

7  using the Ares program.

8          And this screen shot is a small piece of the share

9  1.dat file and the files that were downloaded on this Ares

10  program.

11  **Q.**  Did you prepare this exhibit?

12  **A.**  Yes.

13          MS. RICHARDS:  Your Honor, the United States moves to

14  admit Government's Exhibit 44.

15          MR. HUSS:  No objection.

16          THE COURT:  Received.

17      (Government's Exhibit 44 was received.)

18  BY MS. RICHARDS:

19  **Q.**  When a user downloads a file in Ares, how do they do that

20  once -- they have searched for a file.  Files come up.  How

21  does a user initiate a download?

22  **A.**  There are two ways to initiate a download.  One was to

23  double-click the file name and the second was to right-click

24  on the file name and choose "download."

25  **Q.**  When you talk about -- and if you look at Government's

1   Exhibit 44, in the middle column under "Title," are those the

2   file names for these files that were downloaded?

3   A.  Yes.

4   Q.  Do you see any words that indicate that these files may

5   have contained child pornography?  And let me back up here,

6   though.

7          Were all these files still on the computer when you

8   analyzed the computer?

9   A.  No.  Not all the files were still there.

10  Q.  Do any of these files have keywords in them that

11  indicate -- that would indicate to a person who is

12  knowledgeable about child pornography keywords that the file

13  may contain child pornography?

14  A.  Yes.  I can point out a couple, if you can zoom in on the

15  top section of that.  In this screen shot, we see "pthc" quite

16  a few different times in different file names.

17  Q.  Can you use your finger to circle?

18  A.  Absolutely.  So we have "pthc" here, we have "pthc" here,

19  here, here.  We also see "hussyfan" here.  We see "pthc" down

20  here.  "Ptsc" down here.  "Pthc" here.  They misspelled it,

21  but "ptsc" is here, and "pthc" is here, and "pthc" is here.

22  "Ptsc" is here.

23  Q.  Did you attempt to see what folders the Ares peer-to-peer

24  file sharing program was set to download do?

25  A.  Yes.

1  **Q.** Let me turn your attention to Government's Exhibit 45.

2  Can we please zoom in on the middle of this exhibit.  It's not

3  in evidence yet.  Let me ask you a few more questions.

4        Did you create Government's Exhibit 45?

5  **A.** Yes.

6  **Q.** And what does it show?

7  **A.** This shows the folders that Ares is set to download to and

8  share from.

9  **Q.** Did you prepare this exhibit?

10 **A.** Yes.

11       MS. RICHARDS:  Your Honor, the United States moves to

12 admit Government's Exhibit 45.

13       MR. HUSS:  No objection.

14       THE COURT:  It is received.

15     (Government's Exhibit 45 was received.)

16 BY MS. RICHARDS:

17 **Q.** I think you have already answered this question, but I'm

18 not sure, so I'm going to ask it again.  What does this

19 exhibit show?

20 **A.** This exhibit shows the two shared folders for the Ares

21 program that would allow the users to download and upload,

22 other users to upload from this shared folder.

23 **Q.** What were the locations of the shared folders?

24 **A.** The first download folder would be the E drive\Ares files

25 1," and that's of interest because the E drive is not the root

1   of the eMachine.  So that, to me, tells me this is a different

2   device.

3        The second one would be the C:\Users\Internet\Saved

4   Games/Ares, and that was located on the eMachine.

5   Q.  And was that the folder that we see in the folder and sub

6   folder structure in one of the previous exhibits?

7   A.  Yes.

8   Q.  Are you going to talk some more about external storage

9   devices later in this testimony?

10  A.  Yes.

11  Q.  When you examined Exhibit 1, the eMachine computer, did

12  you recover images that appeared to be children engaged in sex

13  acts?

14  A.  Yes.

15  Q.  What did you do when you located a file like that?

16  A.  When I locate a file that I believe is a child engaged in

17  a sex act, I bookmark it.

18  Q.  How do you bookmark it?

19  A.  Basically, a bookmark is a flag that allows me to put that

20  one item into a folder I create for my report.

21  Q.  And is that within the FTK program?

22  A.  Yes, that is within the FTK program.

23  Q.  Are you also able to see metadata for the files that you

24  bookmark?

25  A.  Yes.  I'm able to see the metadata, meaning created date

1  and modified date, as long as the file is truly still on the

2  device.  If it has been deleted and I need to carve that item

3  back out of the device, it usually does not have the ability

4  to return the metadata, meaning when it was created, when it

5  was accessed.

6  Q.  When you are looking at deleted files, if there is no

7  metadata, how are you able to actually find photos of child

8  pornography if they have been deleted?

9  A.  If a file is deleted, it simply returns back the name

10  "carved," and it will give it a number.  And the number is

11  simply the FTK program assigning it, a name "carved," and then

12  a number.

13  Q.  Let me turn your attention to Government's Exhibit 46.  Do

14  you recognize this exhibit?

15  A.  Yes, I do.

16  Q.  What is it?

17  A.  This is the file list of the bookmarked items that I

18  recovered from the eMachine hard drive.

19  Q.  Okay.  And what items are on this list?  When you say it

20  is a file list, what files are on this list?

21  A.  So in FTK, I generated this list and then exported it to

22  an Excel spreadsheet, and the Excel spreadsheet specifically

23  focuses on the name of the file, the path or location of where

24  that file was saved or stored, and the created date.  And

25  these are all forms of metadata.

1  **Q.**  Are these all files that you looked at on the computer and

2  determined were children engaged in sex acts?

3  **A.**  Yes.  And that is why I bookmarked them.

4         MS. RICHARDS:  Your Honor, the United States moves to

5  admit Government's Exhibit 46.

6         MR. HUSS:  No objection.

7         THE COURT:  It is received.

8     (Government's Exhibit 46 was received.)

9  BY MS. RICHARDS:

10  **Q.**  Now, the jury is able to see Government's Exhibit 46.  Can

11  you go through the meaning of the three columns in this list?

12  **A.**  Yes.  The Name column, specifically, is the name of the

13  file.  The Path column shows me the actual location where the

14  item was saved.  And the Created Date would be the date that

15  file was first saved to the media.  And the media in this

16  example would be the eMachine hard drive.

17  **Q.**  Let's zoom into line item 2.  Okay.  What is the file name

18  for this particular file?

19  **A.**  The file name has "||new|| ptsc kinderkutje nn

20  youngvideomodels 41(2).avi".

21  **Q.**  What does the ".avi" signify?

22  **A.**  The ".avi" is a file extension for a video file.

23  **Q.**  Where was this file saved?

24  **A.**  This file was saved under the root, again, meaning the C

25  drive, "Users/Internet," "Internet," being the user that

1    logged in, "/Saved Games," the Ares folder, and then we have

2    the file name.

3    Q.  And when was this file downloaded to the computer?

4    A.  This file was downloaded February 8, 2015.

5    Q.  Can we please scroll down to item number 32.  Please blow

6    up 32.  Thank you.

7            So we are looking at item 32 now.  And the -- what is

8    the file name here?

9    A.  The file name is "Carved[27877930].bmp".

10   Q.  Is that the actual file name for this file on the

11   computer?

12   A.  No, it wouldn't be.

13   Q.  You testified before that when an item is deleted and you

14   carve it, it gets a carved number; is that correct?

15   A.  Correct.  This would be indicative of that carved number

16   assigned to the image.

17   Q.  Approximately how many deleted child pornography images

18   did you see on this eMachine computer?

19   A.  This eMachine, I was able to recover approximately 113

20   images of carved child pornography.

21   Q.  And approximately how many files did you recover that were

22   not deleted?

23   A.  I recovered 31 images or videos of child pornography.

24   Q.  That were not deleted?

25   A.  That were not deleted.

MICHAEL TUMBIOLO - D

263

1    **Q.** Okay.

2    **A.** Still physically present on this machine.

3    **Q.** Do you recall approximately how many of those 32 -- sorry.

4    Is it 32 or 31?

5           THE COURT:  31.

6           THE WITNESS:  31.

7    BY MS. RICHARDS:

8    **Q.** Do you recall how many of the 31 that were not deleted

9    were videos?

10   **A.** A large majority.

11   **Q.** Did you place any of the files that you -- any of the

12   files from this list on a CD labeled, "Government's Exhibit

13   54"?

14   **A.** Yes, I did.

15   **Q.** Are the images on the CD true and accurate depictions of

16   what you saw on the eMachine desktop?

17   **A.** Yes.

18          MS. RICHARDS:  United States moves into evidence

19   Government's Exhibit 54.

20          MR. HUSS:  Could you repeat the number again?

21          MS. RICHARDS:  54.

22          MR. HUSS:  No objection.

23          THE COURT:  It is received.

24       (Government's Exhibit 54 was received.)

25   ///

1    BY MS. RICHARDS:

2    **Q.**  Which files did you place on Government's Exhibit 54?

3    **A.**  I placed line number 18, 23, and 31 on the disk for

4    preview.

5    **Q.**  All right.  Can we please pull up exhibit 18 -- sorry.

6    Scratch that.  Can we please scroll up to line item 18.

7             And what was the download date for line item 18?

8    **A.**  February 4th, 2015.

9    **Q.**  Okay.  What was the download date for line item 23?

10   **A.**  February 4th, 2015.

11   **Q.**  And what was the download date for line item 31?

12   **A.**  February 4th, 2015.

13   **Q.**  Did you provide a screen capture of one of these images to

14   an FBI agent named Eric Brelsford?

15   **A.**  Yes.

16   **Q.**  When I say "screen capture," can you describe what a

17   screen capture is?

18   **A.**  Yes.  In this example, it was a video, so I took what we

19   call a "sanitized" screen capture, "sanitized" meaning I would

20   not show any of the genital or sexual acts taking place.  It

21   would just simply be something that would show perhaps the

22   head and identifying features of the individuals in the video.

23            And then I take that sanitized image and I did send

24   that to a Special Agent for identification purposes.

25   **Q.**  When you say "for identification purposes," what do you

1  mean?

2  **A.**  In this instance, we believe it to be a known victim.  A

3  known victim is somebody that has been truly identified, and

4  someone such as myself, a Special Agent, would be able to

5  testify that "I know the victim and we saved the victim and I

6  know the image or video associated to the victim," and it now

7  becomes a series, unfortunately.  We have to assign a series

8  name to it.

9  **Q.**  So you sent this image to see if Special Agent Eric

10  Brelsford recognized the victim in it?

11  **A.**  Yes, I did.

12  **Q.**  Can you please look at Government's Exhibit 49.  Do you

13  recognize this exhibit?

14  **A.**  Yes, I do.

15  **Q.**  Is this the redacted screen shot that you sent to Special

16  Agent Brelsford?

17  **A.**  Yes.

18  **Q.**  And what line item did this screen shot come from?  Just

19  for the record, which item did this -- which line item did

20  this come from from Exhibit 54?

21  **A.**  This is line item 23.

22      MS. RICHARDS:  Your Honor, the government moves to

23  admit Government's Exhibit 49, but does not need to publish it

24  at this time.

25      MR. HUSS:  No objection.

MICHAEL TUMBIOLO - D

266

1          THE COURT:  It is received.

2      (Government's Exhibit 49 was received.)

3  BY MS. RICHARDS:

4  **Q.**  Agent Tumbiolo, did you attempt to see if there were

5  recent files that had been viewed by the user of the eMachine

6  computer?

7  **A.**  Yes.

8  **Q.**  How did you do that?

9  **A.**  There is a share list stored in the registry that would

10  show the files that were available.  And then also in IEF, it

11  shows all of the Ares files that are available or were

12  available for sharing.

13  **Q.**  Did you also look at link files during your examination?

14  **A.**  Yes.

15  **Q.**  What is a link file?

16  **A.**  So a link file, for example, if you open a file on your

17  computer one or more times, the operating system says, "I

18  think you might go back to that file," so it creates a link

19  list.

20          That link list is simply the location of where that

21  file is, so the next time you click on that file, it says, "It

22  is right here," and pops it right back up for you quickly.

23  **Q.**  Let me turn your attention to Government's Exhibit 47.

24  What does this exhibit show?

25  **A.**  This exhibit shows the link list for the items associated

1    to the eMachine.

2    **Q.**  So does this show files that were once opened on the

3    computer?

4    **A.**  Yes.

5    **Q.**  Did you prepare this exhibit?

6    **A.**  Yes.

7    **Q.**  How did you prepare it?

8    **A.**  This is a screen capture from the FTK software.

9          MS. RICHARDS:  Your Honor, the United States moves to

10   admit Government's Exhibit 47.

11         MR. HUSS:  No objection.

12         THE COURT:  Received.

13      (Government's Exhibit 47 was received.)

14   BY MS. RICHARDS:

15   **Q.**  Special Agent Tumbiolo, can you describe what the columns

16   mean in this exhibit?

17   **A.**  Yes.  The first column would be the User, meaning the user

18   account that was logged into at the time this information was

19   accessed.

20         The File Path would be the actual location or device

21   that was -- and the file name of what was accessed.

22         The other three columns are the metadata.  We have

23   "Last Write Time," "Last Access Time," and then "Creation

24   Time."

25   **Q.**  There is a file that's highlighted in blue.  Was that file

MICHAEL TUMBIOLO - D

268

1    opened on the computer?

2    **A.**   Yes.  That file was last opened July 28, 2016.

3    **Q.**   Can we zoom in on the time for that file highlighted in

4    blue?  I'm sorry.  I'm looking at the wrong column.

5            So it was last opened on July 28, 2016?

6    **A.**   Yes.

7    **Q.**   What is the difference between -- it says, "Last Access

8    Time, July 29, 2016."  What is the difference between that

9    time and the creation time for this file?

10   **A.**   The creation time is when it was saved to the device.  In

11   this example, it was a E drive.  So, again, that tells me it

12   was not the C drive of the eMachine; it was some other device.

13           The Last Access Time was the last time it was opened,

14   and that would show, in this example, July 29th, 2016.

15   **Q.**   Okay.  Did you use forensic software to determine what

16   external drives had been attached to the eMachine computer?

17   **A.**   Yes, I did.

18   **Q.**   How did you do that?

19   **A.**   There is a USB store that is saved in the registry.  And I

20   used FTK forensic software to pull out that information.

21   **Q.**   Can I turn your attention now to Government's Exhibit 48.

22   What is this document?

23   **A.**   This is the FTK screen capture of the USB store that is

24   located on the eMachine.

25   **Q.**   How did you prepare this exhibit?

MICHAEL TUMBIOLO - D

269

1    **A.**  This is a screen capture from the FTK software.

2            MS. RICHARDS:  Your Honor, the United States moves to

3    admit Government's Exhibit 48.

4            MR. HUSS:  No objection.

5            THE COURT:  It is received.

6         (Government's Exhibit 48 was received.)

7    BY MS. RICHARDS:

8    **Q.**  Special Agent Tumbiolo, what does this exhibit show?

9    **A.**  This exhibit shows all of the devices that were plugged

10   into the eMachine, Exhibit 1.

11           Specifically of interest, right here in the middle,

12   we have the user names that were utilized.  In this example

13   right here, we have "Internet" user.

14           Then we have the last connection time, the device,

15   which is in this one I'm pointing out is "PNY."

16           And then it also shows the mount location.  The mount

17   location is the drive letter assigned to that device.  In this

18   example, we have the F drive.

19           And then it shows the volume label.  The volume

20   label, I can state that USB 2.0 FD volume label is assigned to

21   evidence item number 2, the black PNY 8 gigabyte USB thumb

22   drive.

23           What this doesn't show is the volume serial number

24   associated to that PNY thumb drive.  The serial number I did

25   recover is Volume Serial Number 9C57-0B35.

1    Q.   Thank you.  Were you able to see if -- were you able to

2    find -- or do any of these refer to Government's Exhibit 3,

3    the Lexar thumb drive?

4    A.   Yes.  Right in the middle, this is the Lexar.

5    Q.   What were the last connect times for -- well, let's do one

6    at a time.

7            What was the last connect time for the PNY thumb

8    drive?

9    A.   For the PNY, right here, we see the column "Last User

10   Mount Time."  That is the last time the user plugged the USB

11   device physically into the computer, and that would be

12   July 17th, 2016.

13   Q.   Does this tell you when, if at all, the device was

14   unplugged from the computer?

15   A.   No.

16   Q.   Okay.  When was the Lexar thumb drive last mounted into

17   the computer?

18   A.   The last time the Lexar was plugged in or mounted to the

19   computer would be January 9th, 2016.

20   Q.   Again, does this document show when, if at all, it was

21   ever unplugged?

22   A.   No.

23   Q.   All right.  Let's talk a little bit about the PNY, or I

24   would like to ask you questions about the PNY thumb drive.

25   Again, that's Government's Exhibit 2.  Where was the thumb

MICHAEL TUMBIOLO - D

271

1    drive manufactured?

2    **A.**   The PNY was manufactured in New Jersey.

3    **Q.**   Did you locate any relevant files on that thumb drive?

4    **A.**   Yes.

5    **Q.**   What did you locate?

6    **A.**   I --

7    **Q.**   Actually, strike that question.

8            Can you briefly explain the process by which you

9    located files?

10   **A.**   Yes.  I followed the same process as I do for the eMachine

11   hard drive.  Again, I take a Tableau hardware read-write

12   blocker.  I plug the thumb drive into the write blocker.  That

13   saves me from writing anything to that device.

14           I then plug the write blocker into my computer.  And

15   at that point I use the FTK Imager to create a bit-by-bit copy

16   of that thumb drive or device.

17   **Q.**   Did you look for evidence of ownership of that device?

18   **A.**   Yes.

19   **Q.**   Did you see anything that you thought was relevant?

20   **A.**   Yes.

21   **Q.**   What did you see?

22   **A.**   Pictures that were stored on the PNY device.

23   **Q.**   And did you select one in particular?

24   **A.**   Yes.

25   **Q.**   Let me turn your attention now to Exhibit 51.  Is this the

MICHAEL TUMBIOLO - D

272

1  picture you selected?

2  **A.**  Yes.

3       MS. RICHARDS:  Your Honor, the United States moves to

4  admit Government's Exhibit 51.

5       MR. HUSS:  Sorry?

6       MS. RICHARDS:  The United States moves to admit

7  Government's Exhibit 51.

8       MR. HUSS:  I would object.  Lack of foundation and

9  relevance.

10       THE COURT:  Please approach.

11     (The following proceedings were had at the sidebar, to

12     wit:)

13       THE COURT:  We are at sidebar.

14       Are you waving the presence of your client?

15       MR. HUSS:  Yes.

16       THE COURT:  When you say "lack of foundation," are

17  you saying that it is lack of foundation to indicate that it

18  is the defendant?

19       MR. HUSS:  No.  It is really more of lack of

20  foundation on I don't know when this picture was taken or

21  where it was found.

22       THE COURT:  Well, it looks like a picture taken

23  during the search warrant because he is in his house.

24       MR. HUSS:  Maybe I missed it.  Maybe he said this was

25  something he saw on one of the drives.

MICHAEL TUMBLING - D

273

1      MS. RICHARDS:  I think he testified that he found

2   that on the PNY thumb drive.

3      THE COURT:  He did.

4      MS. RICHARDS:  I can clarify.

5      THE COURT:  He did say that, but now we get to the

6   relevance issue.  What's it for?

7      MS. RICHARDS:  It is to show that the PNY thumb drive

8   was his.  It is a selfie photograph, and there is child

9   pornography on the PNY thumb drive.

10      THE COURT:  It is circumstantial evidence.  It is up

11   to the jury to determine whether that is their conclusion.

12      MR. HUSS:  Submit it.

13      THE COURT:  The objection is overruled, and the

14   exhibit is admitted.

15      (The proceedings at the sidebar were concluded.)

16      THE COURT:  Exhibit 51 is received.

17      (Government's Exhibit 51 was received.)

18   BY MS. RICHARDS:

19   Q.  Where did you recover this photograph?

20   A.  It was recovered from the PNY thumb drive.

21   Q.  Were there other photographs that appeared to depict the

22   same individual as well?

23   A.  Yes.

24   Q.  Did you find any files on the same thumb drive that

25   appeared to be of children engaging in sex acts?

1  **A.**  Yes.

2  **Q.**  Did you flag those files with FTK?

3  **A.**  Yes.  I bookmarked those files.

4  **Q.**  Let me turn your attention to Government's Exhibit 52.  Do

5  you recognize this item?

6  **A.**  Yes.

7  **Q.**  Are these the files that you flagged or is this the -- are

8  these the file names, file path, and the created dates for the

9  files that you flagged in FTK from the PNY thumb drive?

10  **A.**  Yes.  This is the file list of the bookmarked items that I

11  flagged in FTK.  And I followed the same process.  I exported

12  this file list out of FTK into an Excel spreadsheet.

13         MS. RICHARDS:  Your Honor, the United States moves to

14  admit Government's Exhibit 52.

15         MR. HUSS:  No objection.

16         THE COURT:  Received.

17     (Government's Exhibit 52 was received.)

18  BY MS. RICHARDS:

19  **Q.**  Approximately how many child pornography files did you

20  find on the PNY thumb drive?

21  **A.**  I found approximately 142 files or videos, of which 20,

22  approximately 20 are videos and approximately 122 are images.

23  **Q.**  Can we -- so what I want to do now is scroll through the

24  pages.  It looks like there is seven pages to this exhibit.  I

25  want to scroll through the pages so that you can note the

MICHAEL TUMBIOLO - D

275

1  created date range for the items that are on this thumb drive.

2          I want you to point out what appears to be the

3  earliest and what appears to be the latest.  So if we could

4  just start on page 1.

5  A.  Of course.  The earliest created date would be August 1st,

6  2016.

7  Q.  That's the earliest created date?

8  A.  I'm sorry, the most recent.

9  Q.  Okay.

10  A.  And then in this page, it moves down through July 20th,

11  2015, June 25th, 2015, May 23rd, 2015 -- and I'm just picking

12  these at random.

13  Q.  So we are on page 2 now.  What are some of the created

14  dates that you see?

15  A.  Page 2 shows May 10th, 2015, May 2nd, 2015.

16  Q.  Let's go to page 3.

17  A.  Page 3 shows May 2nd, 2015, May 1st, 2015, April 30th,

18  2015.

19  Q.  Now we are on page 4.  Do you see any other dates?

20  A.  Page 4 has April 29, 2015.

21  Q.  And page 5?

22  A.  Page 5 appears to be all April 29th, 2015.

23  Q.  Page 6?

24  A.  Appears to be all April 29th, 2015, and the same for the

25  last page.

MICHAEL TUMBIOLO - D

276

1    **Q.**  What do these dates represent?

2    **A.**  That is the created date, meaning that's the date that

3    file was saved to this device.

4    **Q.**  Were any of these files deleted?

5    **A.**  No.  All of these files were still on the device.

6    **Q.**  Did you place any of these files onto a CD that will later

7    be briefly viewed by the jury?

8    **A.**  Yes.

9    **Q.**  Which items did you place on the CD?

10   **A.**  Line item 2, 94, and 98 were placed on a CD for preview.

11   **Q.**  Can we go back up to page 1 of this exhibit?  Can we

12   scroll -- zoom into line item 2.  Can you make the box a

13   little bit bigger so we can see the created date?

14        Did you send a sanitized screen shot of line item 2

15   to FBI Agent Eric Brelsford?

16   **A.**  Yes.

17   **Q.**  And why did you do that?

18   **A.**  I followed the same process as the previous video.  I took

19   a sanitized screen shot of this image and sent it to the

20   Special Agent for identification purposes.

21   **Q.**  Can you please look at Government's Exhibit 50.  Is this

22   the photo that you sent him?

23   **A.**  Yes.

24        MS. RICHARDS:  Your Honor, the United States moves to

25   admit Government's Exhibit 50, but we will wait to publish it.

1          MR. HUSS:  No objection to 50.

2          THE COURT:  Received.

3      (Government's Exhibit 50 was received.)

4  BY MS. RICHARDS:

5  Q.  And you previously testified that you put three line items

6  from Exhibit 2 onto a disk.  Did you label that disk

7  Government's Exhibit 55?

8  A.  Yes.

9  Q.  And are the images on that disk true and accurate

10  depictions of what you saw on the PNY thumb drive?

11  A.  Yes.

12          MS. RICHARDS:  Your Honor, the United States moves to

13  admit Government's Exhibit 55.

14          MR. HUSS:  One moment.  No objection.

15          THE COURT:  Received.

16      (Government's Exhibit 55 was received.)

17  BY MS. RICHARDS:

18  Q.  Can you confirm now that you placed an exact copy of

19  Government's Exhibit 55 on the government's computer and

20  labeled it Government's Exhibit 55?

21  A.  Yes, I did.

22  Q.  And I didn't ask you that same question for Government's

23  Exhibit 54, so I will ask you that now.  Did you confirm

24  before testifying today that an exact copy of Government's

25  Exhibit 54 was also placed on the government's computer and

MICHAEL TUMBIOLO - D

278

1  labeled thereon as Exhibit 54?

2  A.  Yes, I did.

3  Q.  All right.  Let's go now to your forensic findings for

4  Government's Exhibit 3, which is the Lexar thumb drive.  Did

5  you determine where it was manufactured?

6  A.  Yes, I did.

7  Q.  Where was it manufactured?

8  A.  China.

9  Q.  And analyzing the Lexar thumb drive, did you follow the

10 same steps that you followed in analyzing Exhibits 1 and 2?

11 A.  Yes, I did.

12 Q.  Did you locate any files that appeared to be children

13 engaging in sex acts?

14 A.  Yes, I did.

15 Q.  And when you located the files, what did you do?

16 A.  I followed the same procedure.  I bookmarked the images or

17 videos in the FTK software.

18 Q.  Let me turn your attention now to Government's Exhibit 53.

19 What is this exhibit?

20 A.  This is the bookmarked file list for the Lexar USB thumb

21 drive.

22 Q.  Did you create this exhibit?

23 A.  Yes, I did.

24 Q.  How did you create it?

25 A.  I followed the same procedure.  This is the file list in

1  FTK, and I exported the file list into an Excel spreadsheet.

2  **Q.**  Is this in an Excel spreadsheet?

3  **A.**  Oh, I apologize.  This is actually a screen capture since

4  the file list was in one screen.  I was able to capture it in

5  a screen shot.

6  　　　　MS. RICHARDS:  Your Honor, the United States moves to

7  admit Government's Exhibit 53.

8  　　　　MR. HUSS:  No objection.

9  　　　　THE COURT:  Received.

10  　　(Government's Exhibit 53 was received.)

11  BY MS. RICHARDS:

12  **Q.**  Approximately how many videos and images did you tag as

13  child pornography?

14  **A.**  I bookmarked approximately 19 videos.

15  **Q.**  Approximately how many of these were deleted?

16  **A.**  None of these were deleted.

17  **Q.**  Did you place any of these files on a CD that will later

18  be briefly viewed by the jury?

19  **A.**  I did.

20  **Q.**  Which ones did you place on the CD?

21  **A.**  Line number 5, 10, and 15 were placed on a CD for preview.

22  **Q.**  Okay.  And can you indicate with your finger which files

23  these are since there is no number next to them?

24  **A.**  Yes.  The number 5 would be, "privado warrior 5y

25  kleuterkutje kingpass ptsc."

1   **Q.**  You referred to it as line item 10?

2   **A.**  Number 10 would be, "((hussyfan)) (pthc) -k-k new."

3   **Q.**  And which one is the one you referred to as line item 15?

4   **A.**  15, I believe, would be the "!! new ! toddler girl gives

5   man blow."

6   **Q.**  And did you place them on a CD label Government's Exhibit

7   56?

8   **A.**  I did.

9   **Q.**  Are the images on the CD true and accurate depictions of

10  what you saw on the Lexar thumb drive?

11  **A.**  Yes.

12          MS. RICHARDS:  United States moves to admit

13  Government's Exhibit 56.

14          MR. HUSS:  No objection.

15          THE COURT:  Received.

16      (Government's Exhibit 56 was received.)

17  BY MS. RICHARDS:

18  **Q.**  Did you confirm before testifying today that an exact copy

19  of Government's Exhibit 56 was placed on the government's

20  computer and labeled thereon as Government's Exhibit -- as

21  Exhibit 56?

22  **A.**  Yes, I did.

23  **Q.**  In addition to the three -- these three charged devices

24  that you analyzed, did you conduct any forensic previews of

25  other devices in this case?

1  A.  Yes.

2  Q.  When were those devices seized?

3  A.  The original seizure date of the other devices, I believe,

4  was October 17th, 2016.

5  Q.  Can you briefly describe what a forensic preview is?

6  A.  A forensic preview is done very similar to a bit-by-bit

7  image copy; however, I plug the device into the hardware write

8  blocker, but then I simply use the forensic software to

9  preview the content of that device without going through and

10  actually doing a bit-by-bit copy.

11          And the preview is done for time reasons.  It is more

12  efficient.

13  Q.  Did you analyze -- did you do a forensic preview of thumb

14  drives that were seized during that search warrant?

15  A.  Yes.

16  Q.  Okay.  Approximately how many did you analyze?

17  A.  Two, in particular.

18  Q.  Okay.  Did you see child pornography on those devices?

19  A.  Yes.

20  Q.  Approximately how many images?

21  A.  At least five or more.

22  Q.  Did you conduct a full analysis of those?

23  A.  No, I did not.

24          MS. RICHARDS:  Your Honor, all I have left is to play

25  the images during direct examination.  So I can do that now.

MICHAEL TUMBIOLO - D

282

1      THE COURT:  Okay.

2      MS. RICHARDS:  One moment, please.

3      So at this time, the government would like to publish

4   Exhibits 54 through 56.  They contain the sample child

5   pornography images that Special Agent Tumbiolo previously

6   testified to having pulled from the devices.

7      I'm going to go through -- there is three images per

8   exhibit.  I'm going to show still images for three seconds

9   each, and videos, I will play for under nine seconds each.

10  And we are going to play them without sound.

11     So I'm going to publish Government's Exhibit 54

12  first.

13     THE CLERK:  I can display?  Let me know when.

14     THE COURT:  Yes.  They are all in evidence.

15     THE CLERK:  All right.

16   (The video was played.)

17     MS. RICHARDS:  Can you cut the screen for a minute?

18  We are having a technical issue.

19     THE CLERK:  Yes.  I have theirs off.

20     MS. RICHARDS:  Your Honor, can we take a brief recess

21  so we can work out the issue?  I think we are having issues

22  with the different programs on the computer conflicting.

23     THE COURT:  Let's take the morning recess, 15

24  minutes.  And when you come back, we will show the images.

25  Then that will be the end of direct examination.

MICHAEL TUMBIOLO - D

283

1        We will then move into cross-examination.

2        Please remember, don't discuss the case.

3    (The jury left the courtroom.)

4        THE COURT:  All right.  The jury has left.  Any

5    issues?

6        MS. RICHARDS:  I think we know the answer to the

7    technical problem, but we need to make sure while the jury is

8    not here.  I think it might be showing on their screen and is

9    not showing on this computer, but I didn't want to --

10       THE COURT:  I think I'm seeing what they are seeing,

11   or at least they were, and this appeared to be a manipulation

12   of a penis, and somebody who may have had a young body, I

13   couldn't tell, she was dressed and we didn't see her head.

14       MS. RICHARDS:  Okay.

15       THE COURT:  So that's what I saw.

16       MS. RICHARDS:  All right.  I think that is part of

17   the video, so we will fix the problem in the next few minutes

18   by the time the jury comes back.

19       THE COURT:  We will be in recess.

20       MS. RICHARDS:  Thank you.

21   (Recess)

22       MS. RICHARDS:  Everything is working.  Sorry, your

23   Honor.

24       THE COURT:  That's all right.  Back on the record.

25   Counsel and defendant are present.

MICHAEL TUMBIOLO - D

284

1          Are we ready for the jury?

2          MS. RICHARDS:  Yes.

3          MR. HUSS:  Yes.

4          THE CLERK:  So Megan, right now, all the monitors are

5   on.  Whatever is on that monitor there, that's what's on.

6          MS. RICHARDS:  Thank you.

7          THE COURT:  What's the time estimate of this?

8          MS. RICHARDS:  Two minutes.  It will be very quick.

9          THE COURT:  Mr. Huss, what's your time estimate now?

10          MR. HUSS:  I will be a couple hours.

11          THE COURT:  Okay.

12      (The following proceedings were had in the presence of the

13          jury, to wit:)

14          THE COURT:  We are still on the record, and the jury

15   has again joined us.

16          Any issues, ladies and gentlemen?

17          All right.  Go ahead.

18          MS. RICHARDS:  I'm now going to publish Government's

19   Exhibit 54 through 56 -- I'm sorry for the technical issue --

20   and then start with Government's Exhibit 54.

21          THE COURT:  This should take about two minutes total,

22   ladies and gentlemen, just so you have an idea.

23          MS. RICHARDS:  That was the first image.  I'm having

24   the second image now.  I'm playing the third image.

25          I'm now going to publish Government's Exhibit 55, the

1    first image.  Now play the second video.  And then publish the

2    third image.

3           Now, publishing Government's Exhibit 56, the first

4    video.  The second video.  And the third.

5           I have no further questions for this witness.

6           THE COURT:  Cross-examination, please.

7                        CROSS-EXAMINATION

8    BY MR. HUSS:

9    Q.  You mentioned in part of your testimony that there were a

10   lot of deleted files that you restored; is that true?

11   A.  Yes.

12   Q.  Could you tell approximately how many of these files were

13   deleted?

14   A.  No.

15   Q.  So when you restored them, were you altering what can be

16   seen on the hard drive?

17   A.  From the image they are restored?  I'm not touching the

18   original evidence at all.  Everything is done on the imaged

19   bit-by-bit copy that I created.

20   Q.  What I'm getting at is if another user were to sit down

21   and connect with the hard drive, before you restored the

22   deletions, would that user be able to see what has been

23   deleted?

24   A.  No.

25   Q.  And were you able to determine when those files were

1   deleted, what dates?

2   **A.**   No.   There is no metadata associated to the image.

3   **Q.**   But as far as some of the pornographic images we have seen

4   today in the courtroom, none of those were deleted files,

5   right?

6   **A.**   Correct.

7   **Q.**   Okay.   A lot of the charts that we have seen on the screen

8   were charts that you created with software, true?

9   **A.**   Yes.

10   **Q.**   So if somebody that was a new user were to sit down and

11   plug into Exhibit 1, the eMachine, without that software, they

12   wouldn't be able to see those kinds of charts, would they?

13   **A.**   Is there a chart in particular you are focusing on, or the

14   totality of the charts?

15   **Q.**   Well, most of them.   It would be more than just one.   I

16   could go through each one, but I was trying to simplify it.

17          For example, on a lot of the charts, you will have a

18   user and a file description and then maybe a creation date,

19   modification date.

20          Those kinds of charts that we have seen, if somebody

21   didn't have the software that you have, would they be able to

22   sit down and plug into the eMachine and see those same kind of

23   spreadsheets?

24   **A.**   A general user would not see most of that information, but

25   the documents and the properties associated to the documents,

1  they would be able to find.

2  Q.  Right.  If they knew where to look for them, they could

3  find the file and open it, but they wouldn't get a

4  spreadsheet?

5  A.  No.  I created the, using the FTK software, I created the

6  spreadsheets of bookmarked items.

7  Q.  Are you familiar with the term "hacking"?

8  A.  Yes.

9  Q.  Would you tell the jury what that is?

10 A.  Hacking would be the act of connecting to someone's

11 computer and attempting to recover things such as passwords,

12 personal information, personal identifiers, bank accounts,

13 bank statements, things of those nature.

14 Q.  The software that's available to you, does that allow you

15 to do any of those functions?

16 A.  The forensic software, does it allow me to hack; is that

17 what you are asking?

18 Q.  Yes.

19 A.  No.

20 Q.  Are there different methods of hacking into somebody's

21 computer system?  In other words, is there only one way or are

22 there a multitude of ways that a person can hack in?

23        MS. RICHARDS:  Objection, foundation.

24        THE COURT:  The objection is sustained.  You are

25 going to have to get more specific on the foundation of his

1  knowledge of hacking.

2  BY MR. HUSS:

3  Q.  In your training and experience, have you learned about

4  how, you know, the different methods or techniques of hacking?

5  A.  Yes.

6  Q.  Okay.  And what are those methods and techniques?

7  A.  The primary method would require that the software turn on

8  a form of remote desktop services on the host machine that it

9  was attempting to hack.

10        Or the user would have to currently be connected

11  online and specifically download the software that would allow

12  someone else to access that machine.

13  Q.  How can the hacker do that?

14  A.  How could a hacker hack into a computer?

15  Q.  Yes.  Let's say, for example, somebody has a computer in

16  their home and they are not knowingly allowing others to have

17  access to it.  Can somebody, for example, park a vehicle

18  nearby and connect with their Wi-Fi and get into their

19  computer system?

20  A.  If the Wi-Fi was not secure, then they could use their

21  Internet connection.  If a computer was shared on the internal

22  network, then I suppose it could be accessed, if whatever the

23  user specifies in their computer to share out to other

24  computers, yes.

25  Q.  Is a peer-to-peer system on a computer something that can

1  be hacked?

2  **A.**  If the user were to click or something that would embed

3  programs to allow someone else to access the computer, then

4  yes, it could be hacked.

5  **Q.**  Is that true for the Ares system that has been downloaded

6  on at least one of these devices?

7  **A.**  It would be true for any peer-to-peer computer.

8  **Q.**  When somebody hacks into a computer, is it readily

9  apparent to the person that has that computer who is maybe

10  using it in their home?

11  **A.**  The majority of time, you will notice a lot of other

12  viruses that are installed.  And that's the most common

13  method, is the user accidentally clicks on something in a web

14  page or download, and it installs a bunch of malware, and that

15  is something that would be indicative of possible hacking.

16  **Q.**  Are there also devices that you are familiar with where

17  hackers try to trick people into clicking on things so they

18  can gain access to their computer system?

19  **A.**  Yes.  That's called "phishing."  But the most common means

20  for phishing is to gain information about bank accounts, bank

21  statements, credit card information that the user may have put

22  into web browsers and things of that nature.

23  **Q.**  So it can be done?

24  **A.**  Yes.

25  **Q.**  Are there typical ways, as an investigator, are there

1   typical ways or typical things that are common, where people

2   are trying to gain that access to someone's computer?

3           For example, if they get a request to link in or they

4   get -- another example would be if they get an e-mail that

5   sort of invites them to click on something, are these methods

6   that hackers can use to get access to someone's personal

7   information?

8   A.   That would be a possibility, but in order to actually

9   physically access the machine and not just the items stored,

10  they would need the remote desktop services turned on.

11  Q.   On a number of the charts that you prepared, we see

12  references to a file creation date.  How accurate is the file

13  creation data that we see on your charts?

14          In other words, where did you get that information

15  from when you are going through a computer?  And is it

16  information that can be changed before you get it?

17  A.   Do you mind breaking that into two questions for me?

18  Q.   I will break it down.  I'm sorry.

19          Let's start with when you prepared these charts, you

20  were getting information on a number of the files as to when

21  it was created.  Can you explain how reliable that data is

22  when you are extracting it?

23  A.   Yes.  That data is created by the operating system when

24  that file is saved to that hard drive or device.  So it is as

25  accurate as the date and timestamp of that computer at that

1   time on that operating system.

2   **Q.**  So the computer creates the date and creates that

3   information, right?  It is not something that you create or

4   that you alter in any way?

5   **A.**  The operating system creates that date and timestamp when

6   the file is saved.

7   **Q.**  Can the creation date be changed or -- yeah, or altered in

8   any way by the computer on a later occasion?

9   **A.**  That's why we see the other metadata associated to access,

10  date, time, and last modified date time.

11  **Q.**  So if we see a date that says a modification time, that

12  would indicate that some user went in and modified it or

13  changed it in some way?

14  **A.**  Yes, and then saved it.

15  **Q.**  Now, one of the particular charts that you went over was a

16  chart showing different user names.  Did you ever count up the

17  number of different user names that were showing in this

18  computer system?

19  **A.**  At one point, I had, yes.

20  **Q.**  How many were there?

21  **A.**  I don't recall specifically, but I know there is one

22  called "Programs," one called "Internet," one called

23  "smiley2," and I believe there was at least two others.

24  **Q.**  And you said in your testimony that you, based on what you

25  were seeing, you believed that the primary user was Colin

1    Bosby?

2    **A.**   Yes.

3    **Q.**   Does that mean there weren't any other users of this

4    computer system?

5    **A.**   No.

6    **Q.**   How many other users were there that you could see?

7    **A.**   The only other information that I was able to extract from

8    the machine was that of anything pertaining to Ann Johnston.

9    And then specifically what the forensic software allows me to

10   see is how often these different user accounts were accessed,

11   and the primary account "Internet" was accessed the most.

12   **Q.**   Did you do -- did you, by any chance, do a calculation of

13   the percentage of times that the primary user accessed the

14   computer system?  In other words, 10 percent, 20, a hundred

15   percent?  Was there any percentage that you determined when

16   you say he was the primary user?

17   **A.**   The Internet account accessed the machine the most, and if

18   I had to approximate, I would say at least 70 percent of the

19   time.

20   **Q.**   A number of the documents that you found on the computer

21   system are ones that you used to determine who the primary

22   user was, such as a picture of a driver's license, a car

23   registration, bank statements, things like that, correct?

24   **A.**   Yes.

25   **Q.**   Those are normal documents that you would -- that a person

1    could store on their computer, aren't they?

2    **A.**   Yes.

3    **Q.**   In other words, these are not things that made you

4    suspicious or that you would say, well, this is illegal, to

5    copy a driver's license or a bank statement?

6    **A.**   Are you stating are the documents themselves illegal to

7    have on a computer?

8    **Q.**   Correct.

9    **A.**   No.  The documents that I pulled out are not illegal in

10   nature.

11   **Q.**   Did you find any other documents for other people on the

12   computer system that did not have Colin Bosby's name?

13   **A.**   Very few.

14            MR. HUSS:  Could we have Exhibit 31 displayed?

15       (Counsel conferred off the record.)

16            MR. HUSS:  I'm going to try to handle this by using

17   the Elmo device, using the government's master copies.

18            THE COURT:  I think we are going to ask the clerk to

19   come back in.  She is pretty technically savvy on that.

20            MS. RABENN:  If she could turn the computer back on,

21   then we can control the unit.

22            THE COURT:  She will come right out.  Thanks.

23            Can you ask another question or two without it first,

24   or not?

25            MR. HUSS:  Not really.

1          THE COURT:  Okay.

2      (Pause in the proceedings.)

3          THE CLERK:  Go back on the computer?

4          MS. RABENN:  Yes.

5          THE CLERK:  Okay.

6          MR. HUSS:  Here we have it.

7    BY MR. HUSS:

8    **Q.**  Can you see Exhibit 31 on your monitor?

9    **A.**  Yes.

10   **Q.**  The question I wanted to ask you was towards the top,

11   there is an install date.  Do you see that?

12   **A.**  Yes.

13   **Q.**  And do you believe that's a reliable date when this

14   software system was installed?

15   **A.**  Yes.

16   **Q.**  Is this -- and it is a Windows Vista, right?  Is that the

17   name of the program?

18   **A.**  Yes.

19   **Q.**  This is not a pornographic site or software, correct?

20   **A.**  Correct.

21   **Q.**  And what kind of a system is this that was installed on

22   the computer?  If you were to try to describe it, what is it

23   that it does?

24   **A.**  This is the operating system that manages the computer and

25   hardware and other software on the computer.

MICHAEL TUMBIOLO - X

295

1   **Q.**  When it is installed, is there any record kept or any

2   indicator of who actually installs this system on the

3   computer?

4   **A.**  No.

5   **Q.**  So in 2013, when the Windows Vista program was put on the

6   computer, you don't know who it was that put it on that

7   computer?

8   **A.**  No.

9        MR. HUSS:  Okay.  I'm done with 31.  I would like to

10  next go to 32.

11  BY MR. HUSS:

12  **Q.**  This is, I believe this is a printout from that same

13  software that we just talked about on 31.

14  **A.**  This is a screen capture from FTK.

15  **Q.**  Okay.  So is this something that the computer creates as

16  part of its organization?  Or is this something that a user

17  creates?

18  **A.**  The majority of this would be what the operating system

19  creates during installation and user creation, not all of it.

20  **Q.**  In other words, if somebody installs the Windows Vista

21  program, they should be able to click on something and see at

22  least most of this that was on their computer that was

23  organized and put in there by the software system?

24  **A.**  Yes.

25  **Q.**  As far as you know, is there anything illegal about any of

296

1  these entries or files that are noted here on this exhibit?

2  **A.**  The folder names themselves are not illegal.

3  **Q.**  And when someone sits down to use a computer, would

4  they -- how would they be able to access to see this kind of

5  an organization?

6  **A.**  So on your desktop computer, there is a "My Computer"

7  icon.  And if you were to right-click on My Computer, you

8  could go to File Explorer.  File Explorer would show you the

9  same outline of folders and sub folders on your computer.

10 **Q.**  If you don't do that, will you be able to see this?

11 **A.**  There is other means to do it, yes.

12 **Q.**  Well, no.  But let's say you are using the computer.  You

13 sit down, you turn it on.  You have to actually click on the

14 file folder that you described in order to see this?

15 **A.**  Yes.  But to clarify, you are asking does this pop up when

16 a user sits down at a desktop; is that what you are asking?

17 **Q.**  Correct.

18 **A.**  This does not pop up when a user sits down at the desktop.

19 **Q.**  A user has to go look for this to see it?

20 **A.**  Yes.

21 **Q.**  A user would have to know how to look for it and where to

22 find it?

23 **A.**  Yes.

24 **Q.**  I'm done with 32.

25       I would like to next show 33.  This one is a little

1    bit fainter, but I assume you can read it from where you are.

2    In particular, I wanted you to look at the dates in the

3    middle.  They all appear to be the same day, February the 4th,

4    2015.  Am I reading it correct?

5    **A.**   Yes, February 4th, 2015.

6    **Q.**   And it's all within about a minute or a minute and a half?

7    **A.**   Yes.

8    **Q.**   When somebody created this and accessed it and modified

9    it?

10   **A.**   Yes.

11   **Q.**   And is this -- this is sort of a chart or -- yeah.  Is

12   this something you created on your software?

13   **A.**   This is a screen capture from the FTK program showing the

14   Ares program installation information, or metadata.

15   **Q.**   So if a person sat down to use the computer, how would

16   they be able to see this information if they didn't use the

17   software you were using?

18   **A.**   In order to see this, they would have to find the Ares

19   program, right-click on it, and go to Properties.

20   **Q.**   When you say, "go to Properties," is that another file to

21   open to see what's shown in Properties?

22   **A.**   It is an option when you right-click under the menu that

23   pops up, and it allows you to look at the properties of that

24   program or file.

25   **Q.**   If a person knew how to do that and they went to

1 Properties, is this what they would see, the information on

2 this chart?

3 **A.** No.  It would not be displayed in this nature.

4 **Q.** How would they see these dates?

5 **A.** There would be a Details tab under the properties, and the

6 Details tab would show you then the date created, accessed,

7 and modified.

8 **Q.** And so the -- if the person is trying to find this

9 information, they would have to know that you have to click on

10 properties and then click on another indicator of details?

11 **A.** Yes.

12 **Q.** In order to get this?

13 **A.** Yes.

14 **Q.** Okay.  Does this information tell us who created,

15 accessed, and modified this activity?

16 **A.** No.

17 **Q.** Okay.  Next I would like to have displayed number 34.

18         Now, is 34 a chart or diagram that you created from

19 information you pulled out of the computer system?

20 **A.** This is a screen capture from FTK.

21 **Q.** What does that mean, a "screen capture"?

22 **A.** The FTK program pulls out a list of all applications that

23 were installed on this computer.

24 **Q.** So the FTK program is something you are running to extract

25 information from the computer?

1    A.   Yes.  That is the purpose of the FTK forensic software.

2              THE COURT:  Are you moving 34 in?  I don't see it's

3    in evidence.

4              MR. HUSS:  I would like to first ask a few more

5    questions.  Is it already displayed?  I actually thought it

6    was in evidence.

7              THE COURT:  I assumed that, but it is not.

8              MR. HUSS:  I don't have any objection to it going

9    into evidence.

10             THE COURT:  Any objection?

11             MS. RICHARDS:  No, your Honor.

12             THE COURT:  34 is received and now it can be.

13        (Government's Exhibit 34 was received.)

14             MR. HUSS:  Okay.

15   BY MR. HUSS:

16   Q.   So if a person sits down at the computer and they don't

17   have the software that you've described that you were using,

18   they would not be able to see a chart like this?

19   A.   It would not be displayed in this chart particularly.

20   Q.   Are there any -- under the column names, are there any

21   particular things that appear to have been installed on this

22   computer system that you would say right away, well, that's

23   illegal, or that looks like it is -- involves child

24   pornography?

25   A.   Yes.

1    **Q.**  Which item catches your attention on this list?

2    **A.**  The Ares program 2.3.0.  I know that's commonly used as a

3    peer-to-peer program to download child pornography.

4    **Q.**  Anything else?  Anything else on this list?

5    **A.**  That I know to be used for downloading child pornography?

6    **Q.**  Yes.  Well, that you would say this looks illegal or this

7    looks wrong?

8    **A.**  Nothing else looks illegal.

9    **Q.**  Okay.  So the installation or the presence of a lot of

10   these other programs would not be abnormal or be suspicious?

11   **A.**  Abnormal?

12   **Q.**  Abnormal.  Let me ask it a different way.

13          If you were looking at the computers of maybe a dozen

14   people who weren't accused of anything, that you might see a

15   lot of these programs installed on their systems.  True?

16   **A.**  The majority of them, yes.  The two items in particular

17   that are not Ares, again, they are not illegal to have on your

18   computer.  Some people might have them on their computer.

19          But right here, we see Win Cleaner One Click

20   Professional.  Win Cleaner One Click Professional is a

21   software that goes into the operating system registry and

22   cleans out temporary things, cleans out things that aren't

23   supposed to be there, things you don't use, things that are no

24   longer installed.  So it actually, Win Cleaner cleans up your

25   operating system background.

301

1   **Q.**  Cleaning up a system can be good as well as bad, right?

2   **A.**  Yes.

3   **Q.**  Okay.  Now, the Ares program that you note on this chart,

4   is it illegal to install Ares on a computer system?

5   **A.**  No.

6   **Q.**  What is the purpose of Ares?  What was it originally set

7   up for to make available to computer users?

8   **A.**  Ares is simply a peer-to-peer file sharing program.

9   **Q.**  And is sharing of files illegal or improper?

10   **A.**  Sharing files that do not contain illegal material is okay

11   and proper.

12   **Q.**  Okay.  When you were able to extract this information from

13   the computer system using your software, does it also reveal

14   which user of the computer installed each of these programs?

15   **A.**  No, it does not.

16   **Q.**  In other words, can these be programs installed by

17   different persons?

18   **A.**  I would have to say yes.  I would not be sitting at the

19   computer to know when each one of these was installed and who

20   did it.

21   **Q.**  When we look at the install date, we can see it looks like

22   dates that go back to 2013?

23   **A.**  That's correct.

24   **Q.**  Did you do any investigation to determine who the owner of

25   the computer system was in 2013?

1    **A.**   I do not have any documents that would state who was using

2    the computer in 2013.

3    **Q.**   Okay.  I'm done with 34 now.

4           If we can -- let's see.  If we can go to Exhibit 40

5    and have that displayed.  I believe this is in evidence.

6           Is this something that a user, sitting down and

7    turning on the computer, would see?  This script?

8    **A.**   You are referring to this file path?

9    **Q.**   Yes.

10   **A.**   No.

11   **Q.**   Well, how were you able to find it?

12   **A.**   Using the forensic software.

13   **Q.**   And where did you find it?  I mean where in the computer

14   was this?

15   **A.**   This file was stored under the root, which is the -- in

16   this instance, for the eMachine, which would be what we would

17   see as a C drive, and then the users.  Under Users, it would

18   be the user "Internet."  Under the Internet user, it would be

19   saved under the Documents folder.  And the file name would be

20   the last thing, and that would be, "med_list--smiley-

21   7-17-16.doc."

22   **Q.**   So the document is described as a med list by somebody?

23   **A.**   Yes.

24   **Q.**   Did you ever open it to see if it had a medical list of

25   any kind?

MICHAEL TUMBIOLO - X

303

1    **A.** Yes.

2    **Q.** This is not something that was child porn, right?

3    **A.** No.

4            THE COURT:  "No," it's not right, or "no," it was not

5    porn?

6            THE WITNESS:  This is not child pornography.

7    BY MR. HUSS:

8    **Q.** The reason you preserved this was to show what, who one of

9    the persons was who was using the computer?

10   **A.** Yes.

11   **Q.** Okay.

12           I have no further questions on that exhibit and it

13   can be removed from the screen.

14           Next, I would like to have 41 displayed.  On my

15   exhibit, I have one page of, looks like, a Wells Fargo online

16   banking statement.  Were there -- was there more than one page

17   when you looked at it, if you know?

18   **A.** I don't recall.  Actually, it pulled the specific file

19   out, so this was a one-page file.

20   **Q.** You don't bank with Wells Fargo, do you?

21   **A.** No.

22   **Q.** So you don't know how many pages a normal statement would

23   be?

24   **A.** I do have a bank account, and I know that most statements

25   are more than one page.

1  **Q.**  Okay.  Did you go through this to see if there were ever

2  any entries that were suggestive of the purchase of anything

3  related to child pornography?

4  **A.**  I did not see anything of that nature.

5  **Q.**  Okay.  That can be removed from the screen.

6          Next, I want to display number 42.  I touched on this

7  earlier, about users.  On this exhibit under User Names, you

8  see different user names, right.

9  **A.**  In this example, I see the user name, "Internet."

10 **Q.**  Okay.  I see "User, Internet."  What's the difference

11 between "user" and "user name"?  Is the user name something

12 that a person is typing in to get in as a user?

13 **A.**  In this instance, the User Name column would, correct, be

14 the user name that the person is typing in to access the URL

15 column, or web page.

16 **Q.**  So would it be accurate to say that all of these entries

17 of a user name are on the Internet, they use the Internet

18 system for the computer?

19 **A.**  Clarify that.  On the Internet?

20 **Q.**  Let me rephrase it.  Can you explain the difference

21 between "user" and "user name" on this diagram that you

22 created?

23 **A.**  Yes.  The User column would be the user account logged

24 onto the computer at the time they accessed this Google Chrome

25 page.

1          The User Name would be the user name typed into the

2     log-in requirement for the URL associated to that web page.

3     Q.   For example, about six or seven down, we see the user name

4     "garfieldgal 1961."  Someone would have typed that in to get

5     the access to go to the particular URL file?

6     A.   Yes.

7     Q.   Farther down on the sheet, we see about two-thirds down,

8     the word "Detroit."  Detroit?

9     A.   Yes.

10    Q.   So somebody would have typed in "Detroit" to get access to

11    what's shown there?

12    A.   Yes.  I believe that's for the health portal.

13    Q.   So if you were trying to determine different users that

14    were using the computer, this chart would be indicative of

15    different user names being used?

16    A.   These are different user names being used to log in to web

17    pages.

18    Q.   Now, one person can use all these user names, right?

19    A.   Yes.

20    Q.   And you wouldn't know?  I mean you wouldn't know by doing

21    your examination whether it is one person or multiple people?

22    A.   Correct.

23    Q.   Likewise, if Mr. Bosby commonly used one as the primary

24    user, if someone else used the user name, they could log in

25    using his name, what he normally used, and your forensic tools

1  wouldn't know the difference?

2  **A.**  Correct.  Again, if I'm not actively sitting there when it

3  is put into the web page, I would not know.

4  **Q.**  But at least this exhibit suggests that there were

5  multiple users of the computer, true?

6  **A.**  This suggests that the user was "Internet," but that many

7  user names were utilized on many different web pages, and to

8  me, the totality of the user name that was put in the most

9  frequently was the "clbsmiley67@gmail.com."

10         And to me, that is the initials of Colin L. Bosby,

11  and then "smiley" with "67," to me, that is the -- Mr. Bosby's

12  date of birth.

13  **Q.**  Just to be clear, this exhibit is also a chart that your

14  software created?

15  **A.**  Yes.

16  **Q.**  In other words, if somebody were to sit down at the

17  computer and turn it on, they wouldn't be able to see a chart

18  like this unless they had your software that would extract the

19  information and organize it?

20  **A.**  This is the actual web browser keeping a file.  You would

21  have to have software that would be able to pull out that

22  file, and then you would see this list.

23  **Q.**  So if the person who was a primary user wanted to check

24  and see if other people had been using his file, he wouldn't

25  be able to see this?

1    **A.**  Not right away.

2    **Q.**  Okay.  This particular chart doesn't show dates when the

3    user was using it.  Did you pull that information out or is

4    that -- do we know what time frame this covers?

5    **A.**  No, I don't.

6    **Q.**  So these could be different users over a multitude of

7    years that are kept track of by the computer program?

8    **A.**  Correct, because I did not pull out that information or

9    did not capture that on my screen shot.

10    **Q.**  Okay.  I'm done with 42.

11         I want to next have 43 displayed, the first page of

12    it.  As I recall, you were saying this -- well, let me first

13    start off.  This is a chart your software creates, right?

14    **A.**  Yes.

15    **Q.**  And if somebody sat down at the computer and turned it on,

16    they wouldn't be able to see this kind of a chart?

17    **A.**  No.

18    **Q.**  For you to create the chart, you had software that would

19    go in and look for file descriptions in the Ares search for

20    keywords, I guess?

21    **A.**  That's correct.

22    **Q.**  You had to do something to extract this.  If a person sat

23    down at the computer and turned it on, would they be able to

24    see a chart like this?

25    **A.**  No.  The only way a user might see this is in the Ares

1    search tab, the search window, you have a little drop down

2    arrow.  And so just like a web browser, if there were multiple

3    search terms in there and the user didn't clear that list and

4    they hit that drop-down arrow, it would show them all of their

5    previous search items, but it would not create this list.

6    Q.  But if you were the computer user and you didn't know how

7    to do that, you might not ever see this information?

8    A.  Not formatted in this nature.

9    Q.  The descriptions that we see in the column, like "2yo" and

10   "3yo," where does that come from?  Does somebody using the

11   computer create that?  Or is that something that comes from

12   the Internet that, you know, somebody previously has described

13   the file in that way?

14        In other words, this isn't your creation as far as

15   the description, right?  You didn't put the "2yo," did you?

16   A.  No.

17   Q.  Where did that come from?

18   A.  You are stating -- what you are asking, is these terms

19   were actually, physically typed into the search bar under the

20   Ares search program tab.

21   Q.  How were you able to access that?

22   A.  The IEF forensic software is able to pull that information

23   out of the Ares share files.

24   Q.  If a person sits down and turns the computer on and they

25   don't have that software, would they be able to see that

1   description?

2   **A.**   No.

3   **Q.**   If a person's computer gets hacked, can the person that's

4   hacking the computer system search for things on that person's

5   computer using search terms?

6   **A.**   I have never known that to be the case or have seen that

7   in any case I have been a part of.

8          And, again, you would need some type of remote

9   desktop access, or a remote desktop would have to be turned on

10  on the particular machine in order to gain physical access to

11  the machine.

12  **Q.**   When your software pulls out these descriptions like

13  "2yo," "3yo," is there anything included in that description

14  that shows who the user was when that activity occurred?  In

15  other words, when you pull it out, does the computer say, you

16  know, on this date, this user searched for that?

17  **A.**   No, it does not.

18  **Q.**   Next, I would like to move to Exhibit 44 and have that

19  displayed.  I'm assuming in Exhibit 44, it is like the other

20  charts we are seeing, it is something created by your

21  software?

22  **A.**   So in this example, this screen shot or screen capture,

23  the IEF forensic software pulls the ShareL.dat file from the

24  Ares program.  When Ares is installed, it creates a ShareL.dat

25  file, and that ShareL.dat file actually stores this type of

1  information, all the file names that were downloaded using the

2  Ares program.

3  **Q.**  How did you learn how to you do that?  How did you learn

4  how to pull that out of the computer?

5  **A.**  The forensic software pulls it out for me.

6  **Q.**  Well, do you know how the forensic software pulls it out?

7  **A.**  It knows that there is common files, specifically in

8  peer-to-peer programs, that have ShareL.dat files and that

9  those ShareL.dat files will contain this information.

10  **Q.**  Well, you have had training on how to use the software to

11  do this, correct?

12  **A.**  Yes.

13  **Q.**  If you didn't have the software and the training to do it,

14  would you be able to extract these kind of descriptions or

15  titles from the Ares downloads?

16  **A.**  I would be aware that the ShareL.dat file keeps this

17  information and I would be able to open that file at some

18  point to see what was downloaded or what files were

19  downloaded.

20  **Q.**  How would you be aware of that?

21  **A.**  Through training and experience.

22  **Q.**  And that's advanced training that you have had, right?  I

23  mean that's not training that the ordinary user of a computer

24  would have or have available to them, is it?

25  **A.**  That's correct.

1    Q.   In other words, we might have to be in law enforcement or

2    be part of Homeland Security to get this kind of training?

3    A.   I would say no, because you can figure that out using

4    Google search.

5    Q.   Okay.   The descriptions under Title, I want to -- along

6    with the description, comes a download date.   But the

7    description, is that created before the download date?   In

8    other words, somebody is downloading a file with this title.

9    Is that what this shows?

10   A.   This shows someone has downloaded that file name on that

11   time and date.

12   Q.   So presumably, that's not when the file is created?

13   A.   Correct.   That's when the Ares program downloaded that

14   file.

15   Q.   And the file, before it's downloaded, was in some Internet

16   system somewhere?

17   A.   In this example, using Ares peer-to-peer software, this

18   file would have to be stored or located on another Ares

19   computer running Ares software or computers, and that is the

20   definition of a peer-to-peer environment.

21   Q.   That would be a computer different than the ones that we

22   have talked about here in court?

23   A.   Clarify that.

24   Q.   That would be a computer different than the ones that we

25   have talked about here in court?

1    **A.**   So if I understand your question, you are saying these

2    files were downloaded onto this computer, but from different

3    computers out on the network; is that correct?

4    **Q.**   Yes.

5    **A.**   Yes, that is correct.

6    **Q.**   Do you know what file or what computer that is and who it

7    belongs to?

8    **A.**   No.

9    **Q.**   Is there any way of determining that by using your

10   software?

11   **A.**   Not at this time.

12   **Q.**   If it was created by a different computer and you don't

13   know where that computer is or who it belongs to, is the title

14   indicative of the title that was given to it by the other

15   computer?

16   **A.**   That would be the title that was pulled from the other

17   machine.

18   **Q.**   So you are not suggesting that Mr. Bosby created these

19   titles and designated them before downloading them?

20   **A.**   Correct.  Once he downloaded the file, he could physically

21   change the name of the file, but prior to downloading, the

22   file name would be what was returned in the general search,

23   and then the user would have to double-click or right-click

24   and download that file.

25   **Q.**   Now, you said -- well, you were answering -- I think your

MICHAEL TUMBIOLO - X

313

1  answer assumes that he downloaded it, right?

2  **A.**  The user of this computer using the Ares program

3  downloaded these files.

4  **Q.**  Are you basing that on the fact that he is the primary

5  user of the computer?

6  **A.**  Yes.

7  **Q.**  Okay.  I would like to turn next to Exhibit 46.  Exhibit

8  46 is a eMachine file list that was created by your software,

9  true?

10  **A.**  By the FTK software, yes.

11  **Q.**  And so like with the other items I have questioned you

12  about, if somebody sat down and turned on the computer we have

13  in court here, they wouldn't see a list like this?

14  **A.**  No.

15  **Q.**  But it is organized and created by your software?

16  **A.**  These are the bookmarked items that I believed to be that

17  of child pornography.  And then, yes, the software puts it

18  into this list, and then I exported that list into a

19  spreadsheet.

20  **Q.**  So when you say "bookmarked," does that mean you

21  bookmarked them?

22  **A.**  Yes.

23  **Q.**  What type of list or system were you going through that

24  you then bookmarked certain of the files to put on this list?

25  **A.**  So in the forensic software, once you do the analysis and

1    carving, it returns all of the images or videos that were

2    recovered from the original media.  And I physically have to

3    go through every single image and video, and with very strong

4    discretion, I bookmark them if I believe them to contain child

5    pornography.

6    Q.  These were not files that the user of the computer

7    bookmarked?

8    A.  No.  I would be creating the bookmark in my forensic

9    software.

10   Q.  Normally, users of computer, don't they create a list of

11   favorites to keep track of?

12   A.  There are various ways to create favorites, but I'm not

13   understanding your question in particular.

14   Q.  Well, on some computers, you can click on either a bar or

15   an item on a list and pull up a list of favorites.  Do you

16   know what I'm referring to?

17   A.  I believe you are referring to web browsers and URLs for

18   web sites.

19   Q.  Correct.

20   A.  That is the most common use of favorites.

21   Q.  So a user of Mr. Bosby's computer would have the ability

22   to create a list of favorites; is that true?

23   A.  Not specifically for files, but for web browsing purposes,

24   yes.

25   Q.  Did you create any -- did you find any list of favorites

315

1   that you printed off and made into a chart?

2   **A.**   Yes.  I was able to find a big list of favorite web pages

3   that were created and saved.

4   **Q.**   Is that one of the exhibits we have already seen or one

5   that we haven't gone over?

6   **A.**   It is one we have not gone over.

7   **Q.**   Okay.  On Exhibit 46, the creation dates, are those pretty

8   accurate?  Do you believe those to be accurate?

9   **A.**   Yes.

10  **Q.**   I want to call your attention to -- let's see.  Item 6, 7,

11  8, and 9 all show a date of February the 8th, 2015, correct?

12  **A.**   Correct.

13  **Q.**   But the creation date also shows the timing, the actual

14  down-to-the-second?

15  **A.**   Correct.

16  **Q.**   And how far apart are these in terms of seconds?

17  **A.**   They are very close in terms of seconds.

18  **Q.**   Well, when you say "very close," is it a matter of a few

19  seconds, less than maybe 20 seconds?

20  **A.**   I would agree with less than 20 seconds.

21  **Q.**   Does that indicate that there are -- that these were

22  multiple files being downloaded in some fashion on -- in this

23  computer really close in time?

24  **A.**   I would not state "downloaded."  I would state copied to

25  this machine.  It is possible to say it was downloaded, but it

316

1    is also showing that this list was probably copied to this

2    machine from another device.

3    **Q.**  So the contents of the files might not have been looked at

4    at that time?

5    **A.**  I would not be able to state if the user, sitting there at

6    that point in time, knew or didn't know what they were looking

7    at.

8    **Q.**  But at least this list gives us an indication of the

9    timing involved in the creation of these files in the system?

10   **A.**  Yes.  The created date, again, is the date and timestamp

11   of when that file was saved to this device.

12   **Q.**  And if we look at the actual time in terms of minutes and

13   seconds that the file was created on a computer, we can get an

14   idea of how fast that was being done?

15   **A.**  Correct.

16   **Q.**  And we also know from life experience or common sense that

17   if a user sits down and opens a file and looks at it, that

18   that takes a certain amount of time on the average; it's not

19   something that just happens every couple of seconds?

20   **A.**  That really depends on what you have on your desktop

21   running at that point in time, so it would be hard to

22   speculate how long a file would take to open.

23   **Q.**  Does that mean -- does this list then mean that if we look

24   at the times -- well, if we look at the list, we don't know

25   which of these files was actually opened and looked at?

1   A.   Based specifically on just this list, you would not see

2   that.

3   Q.   So some of the forensic tools that you were using can show

4   just files being either captured or downloaded in the system,

5   whether they were looked at or not?

6   A.   Would you repeat that question?

7   Q.   So Exhibit 46 could show files that were being downloaded

8   or preserved in the computer system that may or may not have

9   been looked at?

10  A.   This list in the software would actually show last access

11  time.

12  Q.   And how can that happen?  If a user sits down to a

13  computer and causes this to happen, is there some type of

14  button they push or does it happen automatically when you

15  click on something?

16  A.   So you are referring to how does the last access time

17  change?

18  Q.   Yes.

19  A.   The user would need to open that file or click on and open

20  that video.

21  Q.   Next I would like to have Exhibit 47 displayed.  Does

22  Exhibit 47 -- well, this, again, is a chart that was created

23  by your software?

24  A.   Yes.

25  Q.   And this is not something that a normal user of a computer

1  could turn on the computer and see?

2  A.   Correct.

3  Q.   The file path information, where does that come from when

4  you use your software?

5  A.   That is the -- this is the link store document that is

6  created in the operating system, and the file path is the

7  actual file path of where that item was opened from.

8  Q.   And in the top half of this exhibit, it appears to show

9  the names of movies?

10  A.   Correct.

11  Q.   Can you tell by looking at that if somebody was

12  downloading movies?

13  A.   In my opinion, yes.

14  Q.   And then over on the other side where we have Last Write

15  Date, Last Access Time and Creation Time, this would capture

16  when somebody was downloading those things?

17  A.   Correct.

18  Q.   Does it go backwards chronologically?  In other words, the

19  date on the top is August 11th.  The date on the bottom is

20  July 29th.  It seems like the dates are going from most recent

21  to less recent.  Is that how this software organizes this

22  information?

23  A.   I clicked on Last Write Time to organize it newest to

24  oldest.  That is how I sorted the data.

25  Q.   Okay.  The top entry appears to correspond with the date

1    of the first search warrant, August 11th.  And I know you

2    weren't there, but if I tell you that's the day of the first

3    search warrant, then the description of the file path, what

4    does that mean?  Does that mean that the computer was turned

5    on by somebody and looked at?

6    A.  It simply means the Downloads folder was last accessed on

7    August 11, 2016.  I wasn't there, so I don't know, I can't

8    speculate what was on or not on on the computer.

9    Q.  But if we look at the file creation -- wait a minute.

10   Let's see.

11          Let's look first at the time that it shows, 12:34,

12   last accessed.  If I -- is this indicating when somebody was

13   using the system in relation to when the search warrant was

14   being executed?

15   A.  Yes.  That specifies the "C:\users\Internet\Downloads"

16   folder was last accessed at 12/34 a.m., on August 11, 2016.

17   Q.  Do you know who was accessing the computer on that date at

18   that time?

19   A.  The person using the account or user account, "Internet."

20   Q.  "Internet."  Could that have been one of the police

21   officers or agents?

22   A.  No.

23   Q.  Couldn't have?

24   A.  We do not execute warrants at 12:34 a.m. unless we have

25   the judge sign off on night execution.  So typically, we do

1   not execute warrants at that time.

2   **Q.**  Well, but this is 12:34.  Is this military time?  In other

3   words, would that be just after lunchtime?

4   **A.**  I believe that would be first thing in the morning.  If it

5   was just after lunch, it would say "p.m."

6   **Q.**  Okay.  So then when you look at this data that you pulled

7   out, and acknowledging that you weren't there at the search

8   warrant, if the search warrant was executed on August 11th,

9   you are saying that shortly after midnight, at 12:34, somebody

10  was using this computer?

11  **A.**  If you are referring to shortly after midnight, it would

12  be shortly after midnight, on August 10th, and then that would

13  roll into August 11th, the morning of.

14  **Q.**  If that's the case, why does your chart show August 11th

15  and not August the 10th?

16  **A.**  Because it was just after midnight, so to the computer

17  operating system, it would be the next day.  And the computer

18  operating system manages the date and timestamp and so would,

19  therefore, update the information accordingly.

20  **Q.**  Does this information reveal where the device was located

21  at the time that this information is created and preserved?

22  **A.**  It, for this example that you are referring to, shows the

23  C drive, which is the root of the computer.

24  **Q.**  And you are referring to the eMachine, the tower that's

25  sitting in the courtroom?

1    A.   Yes.

2    Q.   Okay.  I would like to turn next to Exhibit 48, and have

3    that displayed.  This is a chart created by your software,

4    correct?

5    A.   My software pulls this out of the operating system

6    database, and it's known as a "USB store," and that is how my

7    software pulls it out of the operating system registry.

8    Q.   In the first column vertically, it has "Users," so are

9    there different users listed there?

10   A.   Yes.

11   Q.   And over under "Last User Mount Time," would that be the

12   time, the date and time when that user was using the device?

13   A.   That would be the date and time the user plugged that

14   device into the computer.

15   Q.   Okay.  Under the column "First Connect Time," would that

16   record when the device was first connected to the computer?

17   A.   Yes.

18   Q.   And it could have been connected on later occasions then?

19   A.   Every instance, it would have been plugged in, it would

20   show a entry.

21   Q.   Were you able to capture when the item was removed from

22   the computer system, like if it was like a thumb drive as you

23   described, does it record when it gets removed?

24   A.   No.

25   Q.   Does this indicate -- does the chart have any information

1  that indicates who plugged in the thumb drives on those dates?

2  **A.**  It tells me the user was logged into or using the user

3  name "Internet\programs\smiley2" and so on.

4  **Q.**  Okay.  If we can go to Exhibit 52.  This is a list created

5  by your software, correct?

6  **A.**  This is the bookmark list of items that I bookmarked in my

7  software.

8  **Q.**  And you were the one who bookmarked them?

9  **A.**  Yes.

10  **Q.**  From a bigger list?

11  **A.**  Yes.

12  **Q.**  And the bigger list would have been a list of file names?

13  **A.**  Yes.  Well, images and videos with file names.

14  **Q.**  So if the user of the computer sat down and turned on the

15  computer, they wouldn't be able to see this bookmarked list?

16  **A.**  If I understand your question, it would not pop up

17  immediately for the user to see it this way.

18  **Q.**  How would your software find this on the computer system?

19  **A.**  If you looked at that device in the File Explorer, it

20  would come up very similar to this.

21  **Q.**  If you didn't know how to do that, would you be able to

22  find those files?

23  **A.**  Yes.  Simply by clicking on that device that is attached

24  to the computer, it would show you the file names.

25  **Q.**  Okay.  Is the last column to the right, where it says,

1    "Created," is this when the file was created or when it was

2    downloaded?

3    **A.**   That is when that file was physically saved to that

4    device.

5    **Q.**   Does it show which user did the saving?

6    **A.**   No, not in this example.

7    **Q.**   Couple of general questions about thumb drives --

8    **A.**   Yes, sir.

9    **Q.**   -- and how they work.  I assume you have training on that?

10   **A.**   Yes, sir.

11   **Q.**   If a thumb drive is not plugged into a computer system,

12   will it record or extract anything that's ongoing in the

13   computer system?

14   **A.**   No.

15   **Q.**   Okay.  And why is that?  Does it have to be connected to

16   the computer in order to function as a storage device?

17   **A.**   A couple of reasons why.  The first is that when it is

18   plugged into the computer, the port on the computer itself

19   provides power to that media or USB device.  And then

20   secondly, it has to be plugged into the computer for the

21   operating system to recognize that device and save or read

22   from that device.

23   **Q.**   Did you do any comparison through your software of items

24   stored on the different thumb drives to see if there was any

25   overlapping or duplication?

1   **A.** So based on my analysis, I did not see any duplication.

2   **Q.** How long will the information stay on the thumb drive?

3   **A.** Will you clarify that question, please.

4   **Q.** Sure.  If a thumb drive is attached to a computer and it

5   stores some information, like files or information that's

6   occurring with the computer, does it stay forever?  Or will it

7   fade out eventually or does it have to be removed, otherwise,

8   it will always be there?

9   **A.** It will almost always be there.  It would take a very long

10  amount of time for that hard drive to lose the information,

11  and we are talking a very long time.  Or the user would have

12  to overwrite or delete that file.

13  **Q.** Presumably, if you buy the thumb drive brand new, it

14  should be clean of anything stored, right?

15  **A.** It would absolutely be clean of any personal content.  It

16  would have files of general software to run the USB device.

17  **Q.** Is there anything -- any program or way for the user of a

18  computer to clean his own thumb drive?

19  **A.** Yes.  There are programs available to clean many things.

20  **Q.** In this case, have you seen any evidence of any cleaning

21  devices for the thumb drives?

22  **A.** Cleaning devices?  Or cleaning software?

23  **Q.** Well, either.  Either.  Something to clean the thumb

24  drives?

25  **A.** Yes.  I would have to refer back to the exhibit that shows

1    all of the programs installed so I don't misquote it, if I

2    could.  So under Exhibit 34 --

3    **Q.**  Do you want me to have that displayed?

4    **A.**  Yes, please.

5    **Q.**  Could we have that now?

6    **A.**  Under Exhibit 34, right above the Ares program, we have

7    Duplicate Cleaner Free, 3.2.6, installed.  This program

8    actually scans the computers and removes any files with

9    duplicate names.

10   **Q.**  In your software examination of the computer system, was

11   there any indication that that cleaning program or tool was

12   used?

13   **A.**  I did not specifically look at that.

14   **Q.**  Now, if a person acquires a thumb drive not brand new from

15   a store, but from somebody else who used it, how would they be

16   able to clean that before they used it?

17   **A.**  So if you open up that device, you can actually simply

18   right-click on that device and format the device.  And

19   formatting the device, you are able to give it a label name.

20   And you, at that point, would essentially remove that master

21   file table.

22        I know it's been since yesterday, but that master

23   file table is the address of every file stored on a driver

24   device.  So by formatting it, you remove that master file

25   table.  In essence, you make that complete drive available for

1  new storage.

2  Q.  I would like to ask you a few questions about the use of

3  search terms.  You understand what I mean by "search terms"?

4  These are --

5  A.  Yes, sir.

6  Q.  These are words that are typed in to look for something,

7  like on Google or some other form of Internet?

8  A.  So this is a general question about search terms, not

9  specific to any application?

10  Q.  Right.  Some of the -- did some of the lists that you

11  created list specific search terms that were used by anyone,

12  any user of this computer?

13  A.  Yes.

14  Q.  Okay.  If somebody gains access to a computer system

15  through some form of hacking, can they use that computer to

16  search for things?

17  A.  I have never known that to be the case.  You could, if

18  remote desktop services was turned on and you had direct

19  access to that computer physically.  Remote desktop allows you

20  to remotely log into a computer, and when it opens up, you are

21  on the desktop, like any other user.

22        However, in this instance, a remote desktop services

23  was not enabled.

24  Q.  But if someone had that tool, they could do searching on

25  somebody else's computer?

1  **A.**   In my training and experience, I have never seen that
2  happen.
3  **Q.**   Could a person who has gained access to hacking download
4  files?
5  **A.**   Yes.
6  **Q.**   How would they find the files if they couldn't search?
7  **A.**   Clarify the question, please.
8  **Q.**   How would that person that is downloading files by
9  invading somebody else's computer system find those files
10  without being able to search?
11  **A.**   Again, that's why I state that you would need the remote
12  desktop services to be able to pull up the Ares program and,
13  you know, do the search using the Ares program.  I did not
14  find that to be the case in this instance.
15  **Q.**   Do you have the ability to connect with somebody's
16  computer in an investigative way and search for things?
17  **A.**   We have the ability to use the Ares protocol or program,
18  and search the Ares network for people sharing files
19  indicative of child pornography for downloading.
20  **Q.**   How is it that you are -- well, are you able to do that
21  without the person knowing that you are doing it?  The person
22  that owns the computer?
23  **A.**   The only files we could download from the other Ares
24  clients would be the files contained in the Ares Share folder.
25  And in my opinion, that person who installed Ares on that

1  computer where I'm pulling the file from would have installed

2  the program and put -- specified the Ares Share folder.  So in

3  my opinion, they would know they are sharing any file that's

4  in that shared folder.

5  **Q.**  But they wouldn't necessarily know that someone from law

6  enforcement was going in and downloading those files?

7  **A.**  No.  They would simply see the file queued up for transfer

8  out, and I would look like a Ares client, just like they would

9  look like to anyone else on the Ares program or peer-to-peer

10  network.

11  **Q.**  In your training and experience, have you been taught how

12  a service provider can remotely access someone's computer to

13  do servicing or repair work?

14  **A.**  Yes.

15  **Q.**  For example, AT&T, if you call them up and you say you

16  have a problem, they can actually help you over the phone,

17  correct?

18  **A.**  Yes.

19  **Q.**  Have you ever been in a situation where you have actually

20  watched them move the arrow and fix things without touching

21  your own computer?

22  **A.**  I have not.

23  **Q.**  But you know that they have that capability?

24  **A.**  Yes.

25  **Q.**  Okay.  So if they have that capability, and if law

1    enforcement has the capability to go in and download Ares

2    files, does that mean that other people can't also have that

3    capability or learn how to do that as hackers?

4    A.   So if I understand your question, in the Ares program, in

5    order to share files, the user sitting at the computer has to

6    initiate the share folder for other Ares clients to actually

7    access it.

8         In the instance of an Internet Service Provider, such

9    as AT&T, accessing your computer, you physically have to be in

10   front of the computer and accept their request to access your

11   computer.

12   Q.   Okay.  You were testifying briefly about carving.

13   A.   Yes.

14   Q.   And as I understood it, carving is a process where you

15   retrieve things that are deleted?

16   A.   Yes.

17   Q.   And how many files that you thought reflected child

18   pornography did you carve or recreate?

19   A.   From Exhibit 54, there were approximately 113 images

20   carved from the eMachine.

21   Q.   Do you know what a Trojan horse is?

22   A.   Yes.

23   Q.   In the context of computers.  I don't mean a real Trojan

24   horse.

25   A.   Yes.

1  **Q.**  Can you explain what that is?

2  **A.**  A Trojan horse, most commonly you see as them as the

3  spyware that has the pop-ups all over your screen, so if you

4  accidentally click on something that allows that program to be

5  installed, the Trojan horse would embed in your registry or

6  computer and start doing all the pop-ups that is indicative of

7  the viruses.

8  **Q.**  Once that is done, can the person get access to what is in

9  your computer system?

10  **A.**  Not necessarily.  It would depend on the level of the

11  Trojan horse.

12  **Q.**  Explain that.  When you say "not necessarily," it means to

13  me that maybe sometimes it can.

14  **A.**  Most commonly, the Trojan horse is designed to either

15  annoy the user with the pop-ups or it is designed, in my

16  experience and training, it is designed to try to capture any

17  web browsing data, such as passwords or credit card numbers,

18  user information, your Social Security, things of that nature.

19        And then sometimes it is able to send that back

20  sometimes using your e-mail, depending on how it is set up,

21  back to the person who created the Trojan horse.

22        MR. HUSS:  I would like a little bit more time to

23  review my notes to complete the cross-examination.  Could we

24  take our -- wait.  We are not doing a recess.

25        THE COURT:  We can take a 15-minute break.  I

1  indicated we were going to take two this morning.

2          MR. HUSS:  That would be my request.

3          THE COURT:  All right.  Ladies and gentlemen, let's

4  take 15 minutes, and then we will come back, finish with this

5  witness, and probably get one more witness in before we break

6  at 1:30.  Please don't discuss the case.

7     (The jury left the courtroom.)

8          THE COURT:  Let the record reflect the jury has left

9  the courtroom.

10          Does that tell me you are almost done?

11          MR. HUSS:  Please say that again.

12          THE COURT:  Does that tell me you are almost done

13  with cross?

14          MR. HUSS:  We are just about done.

15          THE COURT:  Okay.  And do you have much redirect?

16          MS. RICHARDS:  Not much, no.

17          THE COURT:  And then we have the other witness, the

18  last witness that you want to put on?

19          MS. RICHARDS:  That's right.  And the last witness

20  will be five or ten minutes.

21          MS. RABENN:  At most.

22          THE COURT:  Okay.  My intent would be then to,

23  whenever the government rests, if you have any type of a

24  motion, we will hear it.  Otherwise, we will break until

25  tomorrow morning.

1              Assuming that occurs, what is your plan for tomorrow?

2              MR. HUSS:  I know for sure I will have one of the

3    agents come back, and I have identified her and let the

4    prosecutor know.

5              I will be discussing with my client whether he will

6    be a witness, but because of the dialysis, I won't be able to

7    know that until I go see him tonight at the jail.

8              THE COURT:  Okay.  And if he does testify, he is the

9    second witness.  If he does not, are you resting?

10             MR. HUSS:  Most probably.

11             THE COURT:  Okay.  Then we should assume the worst

12   case scenario as far as being prepared, and that would be if

13   he does not testify, and then we would -- I would finish the

14   instructions and we would then go into closing arguments.

15             So be ready.  All right.  We will be in recess for 15

16   minutes.

17        (Recess)

18             THE COURT:  Any more questions?

19             MR. HUSS:  Yes, just a few.

20             THE COURT:  All right.  Back on the record.  Counsel

21   and defendant are present.

22             Are we ready for the jury?

23             MS. RICHARDS:  Yes, your Honor.

24             THE COURT:  Okay.

25        (The following proceedings were had in the presence of the

1      jury, to wit:)

2           THE COURT:  All right.  We are still on the record.

3   The jury has again joined us.

4           Any issues, ladies and gentlemen?

5           All right.  You have a few more questions, you say?

6           MR. HUSS:  Yes.  Thank you, your Honor.

7   BY MR. HUSS:

8   Q.  I want to ask you a few questions about the peer-to-peer

9   program and Ares.  First, does the Ares peer-to-peer program

10  run automatically in any way without a person doing anything

11  once it is installed?

12  A.  When you say "run automatically," are you saying could it

13  search on its own and could it download on its own?

14  Q.  Well, it would include that, but.

15  A.  No, it would not do that.

16  Q.  Okay.

17  A.  The program itself would be running if it is in the

18  startup folder or specified to start up with the operating

19  system.

20  Q.  When it is running, what are the capabilities of the

21  system without the user doing anything?

22  A.  The program is just there like Internet Explorer, or any

23  other program, the user has to interact and request from it.

24  Q.  If somebody else gets access to the computer that's not

25  the user, like through hacking, then they can use that system

1  to download files?

2  **A.**  It would be possible.

3  **Q.**  Okay.  Do you know what a firewall is?

4  **A.**  Yes.

5  **Q.**  Would you tell the jury what a firewall is.

6  **A.**  The Windows firewall in this example, and it was turned on

7  on this computer, the firewall stops known applications and

8  programs from accessing your computer from a remote location.

9  **Q.**  Does a firewall interfere with a peer-to-peer program that

10  was installed?

11  **A.**  No, because when you install the peer-to-peer program, the

12  way that the firewall works, it actually stops port numbers.

13  And a port number is something, for example, like 8080.  And

14  so the firewall would stop certain traffic coming through

15  known port numbers that people commonly use for hacking.

16          And so when you install the Ares program, you are

17  telling the computer and the firewall to allow a specific port

18  that Ares uses to transfer and receive information.

19  **Q.**  Does a computer typically keep track of firewall activity?

20  **A.**  Not typically.

21  **Q.**  By that, I mean is there any way to go into a computer

22  and, by checking the firewall system, determine how many times

23  someone has tried to breach the firewall?

24  **A.**  Not in general.  It wouldn't track that.

25  **Q.**  Well, what about, when you say, "not in general," is there

1  any way for a forensic examiner to examine the firewall used

2  on a computer to see if there had been any attempted breaches?

3  A.  It does make a log file of activity.  All operating

4  systems will make log files of activity.

5  Q.  Did you do this in this case, check the firewall function

6  on the computer to see to what extent that might have

7  happened?

8  A.  No.  In this case, I simply looked at the computer to see

9  if the firewall was up and running.

10  Q.  And so to be clear, the firewall would not interfere with

11  the Ares program or the peer-to-peer program?

12  A.  Correct.

13  Q.  How about antivirus, what is that?  Is that the same as a

14  firewall or is it something else?

15  A.  No.  An antivirus is something that you install on your

16  computer and that you have to physically scan your computer.

17  Or the majority of time, it is running what we call "real

18  time," so it is always running.

19       So, for example, if you have a virus that tries to

20  attack your computer, it would know to -- basically, they know

21  what file names and what file types and where these files try

22  to attack.  And so your antivirus would stop that and

23  quarantine that item that was trying to install on your

24  computer and access your computer, and it would create a log

25  file for that quarantine and wait for you to say, "Delete it"

1    or "What do you want to do with these items?"

2    **Q.**  Does a computer system have a clock?

3    **A.**  Yes.

4    **Q.**  In a report that you prepared that I reviewed, you made

5    reference to the clock on this system, did you not?

6    **A.**  Yes, I did.

7    **Q.**  And I believe in your report, you noted the year 2008?

8    **A.**  That's correct.

9    **Q.**  What significance did that have in your examination that

10   caused you to put that reference in a report?

11   **A.**  So based on my training and experience, the report and

12   reference is my third ROI, or "Report of Investigation."  And

13   that report is based on the fact that I took the original

14   image of the device, and I used FTK Imager and I converted it

15   onto my own hard drive.

16          So I took the exact image of that operating system

17   and all its files and folders and sub folders and converted it

18   to my own clean hard drive.

19          I took that clean hard drive and I physically put it

20   into this eMachine so that I would replicate what the user

21   would see when they powered the machine on.

22          The original drive was nowhere near the machine at

23   the time.  Once I powered it on, I'm then able to see the

24   desktop, just like the user would see the desktop.

25          At that time, I clicked on the bottom right corner

1  system clock, and the system clock showed information of 2008.

2  And I concluded the reason for that specifically is that this

3  machine has been in storage for over about the year,

4  approximately.  And that the CMOS battery, which is the

5  battery that is actually physically on the motherboard, that

6  battery is responsible for controlling the CMOS.  The CMOS

7  information is the actual system clock, date and time.

8          And that battery keeps that information in the CMOS

9  chip so that it's accurate.  The battery had died.  In my

10  training and experience, and, therefore, the system clock,

11  when I powered the machine back up, shows the date and time

12  that it defaults to, which happened to be 2008.

13  Q.  So are you saying that when you did your examination, the

14  system clock, because of what you believe happened through

15  storage, was off, it was out of sync?

16  A.  Correct.  It had no information.  And when I restored my

17  image to the computer, the physical computer, the eMachine,

18  because the eMachine CMOS that stores the actual date and

19  time, and it needed that battery, that simple little round

20  battery to keep that little CMOS chip up and running, that

21  battery died.  In essence, the CMOS chip would lose its

22  information.  And so, therefore, when I booted up this

23  particular eMachine, it would show the default date and time.

24  And that's what came up, 2008.

25  Q.  So based on that clock inside the computer, at least the

1   clock was off by what, about nine years?

2   A.   Well, I concluded that's not the accurate clock and date

3   and time that the computer would show when it was up and

4   running.

5   Q.   But at least the clock that you were seeing that you

6   activated was about nine years off?

7   A.   Correct.   It has to default back to an install time or a

8   general time.

9   Q.   So would that affect all the times that we are seeing on

10   the file creations?

11   A.   In my opinion, it has no bearing on the actual file

12   creation information.

13   Q.   Well, if the computer's clock, because of storage, was

14   off, why can't some of these file creation dates and times be

15   off?

16   A.   That's simple.   All these files were saved quite a bit of

17   time before the battery died on this computer.

18   Q.   Did you do any examination of a laptop belonging to the

19   defendant?

20   A.   Yes.   I did a forensics preview.

21   Q.   Did you file any -- find any file sharing programs on his

22   laptop?

23   A.   I don't recall that.

24   Q.   Okay.   But if you did, you would at least have more charts

25   and things to show us here?

1  **A.**  If I had done a full forensic examination of the laptop, I

2  would have definitely had more exhibits.

3  **Q.**  Are you aware from your own training with -- that involves

4  hacking, that the CIA, for example, uses hacking to spy?

5  **A.**  I cannot state anything referencing the CIA.

6  **Q.**  Are you familiar with a program that the FBI has used

7  called "Gizmodo"?

8          MS. RICHARDS:  Objection, relevance.

9          THE COURT:  Sustained.

10         MR. HUSS:  Okay.  I believe that concludes my

11  cross-examination.

12         THE COURT:  Redirect?

13                      REDIRECT EXAMINATION

14  BY MS. RICHARDS:

15  **Q.**  Good afternoon, Special Agent Tumbiolo.  I just have a few

16  questions for you.

17         During cross-examination, you were asked a lot of

18  questions about hacking and computer intrusions.  Did you look

19  for any evidence that hacking had taken place on the eMachine

20  computer?

21  **A.**  Based on virus scans and other general looking at system

22  information, I didn't see anything that would specify hacking.

23  And, again, I come back to the remote desktop services or

24  terminal services connections was not enabled, so.

25  **Q.**  Okay.  And how did you check that?

1    **A.**  The -- well, first I ran the antivirus against the image

2    that returned no malware.  And that's very typical in hacking

3    instances.  Most machines will have malware.

4          The other thing that struck me as interesting was the

5    fact that this computer didn't have any malware.  It is very

6    indicative of peer-to-peer programs, such as Ares, to

7    constantly download malware for viruses to try to intrude your

8    system.  So this machine was very clean, believe it or not.

9          And then additionally, I took the image and I put it

10   back onto my own clean hard drive, and I booted up the

11   computer.

12         And at that point, I was able to go into it as if I

13   was sitting at the machine in its original inhabitant or

14   environment, and I looked at the terminal services

15   connections, and I was able to determine that the service was

16   turned off.

17   **Q.**  What did that tell you?

18   **A.**  In my opinion, that tells me that specifically, nobody is

19   able to remotely access this computer.

20   **Q.**  Was there anything about the child pornography files that

21   you found on the computer that makes the evidence also

22   inconsistent with the computer being hacked?

23   **A.**  Yes.  The fact that the videos, several of the videos were

24   still in the Ares Share folder, and then also the fact that

25   many of the files, especially file paths, were USB drives that

1    were plugged into the computer, I don't know how one would

2    hack a computer and then plug in a USB drive and then save to

3    that USB drive.

4    **Q.**  Is there anything about the creation times of the files

5    that would be consistent or inconsistent with hacking?

6    **A.**  Yeah.  The creation times are all -- there is quite a

7    variety of creation times.  So in my experience, hacking would

8    be a very limited amount.  It would all be at one time, and

9    they would try to get out.

10   **Q.**  May I please bring up Government's Exhibit 44.  Mr. Huss

11   spent a little bit of time showing you some of the United

12   States' exhibits and asking you questions about what

13   information the computer user would actually be able to see on

14   the computer.

15         I think you testified that some things that are in

16   your exhibits from FTK or Internet Evidence Finder are not

17   things that the user of the computer would see.

18         Can you explain, in reference to peer-to-peer file

19   sharing, what types of things a user would actually be able to

20   see?

21   **A.**  Yes.  First and foremost, they would see the file name.

22   And then in the file sharing program, depending on what type

23   of file is being returned; if you are looking for music, it

24   might show you such information, such as metadata, like the

25   album name or the artist name, things of that nature, so

342

1  that's what you would see, but primarily the user would see

2  the file name.

3  **Q.**  When the user would select a file to download, how would

4  they do that?

5  **A.**  Again, there is two ways to do it.  You can double-click

6  the file name or you can right-click on the file name and

7  choose the download option.

8  **Q.**  And we can take this down.

9       Let me turn your attention to the Government's

10  Exhibits 2 and 3, the thumb drives.  Would the user be able to

11  see the child pornography files that you saw on the flash

12  drives on those devices if the user plugged them into their

13  computer?

14  **A.**  Absolutely.

15  **Q.**  How would the user be able to see the files that were on

16  those devices?

17       And we can go one at a time.  Let's talk first about

18  Exhibit 2.  If the user of the computer plugs in that PNY

19  flash drive, what would they have to do to be able to see file

20  names or to open the file?

21  **A.**  They would need to find the device under File Explorer and

22  then double-click on it, and then it would show all the

23  content of that device.

24  **Q.**  Would they see the file names?

25  **A.**  Absolutely.

343

| | |
|---|---|
| 1 | **Q.**  And how about Exhibit 3, the Lexar thumb drive?  How would |
| 2 | the user be able to see the file names on that device? |
| 3 | **A.**  Again, they would find it in the File Explorer, |
| 4 | double-click or right-click on it, and it would show in the |
| 5 | right pane all the file names. |
| 6 | MS. RICHARDS:  I have no further questions. |
| 7 | MR. HUSS:  I have no questions. |
| 8 | THE COURT:  Sir.  You may step down.  Thank you. |
| 9 | THE WITNESS:  Thank you, your Honor. |
| 10 | MS. RABENN:  The United States calls Special Agent |
| 11 | Eric Brelsford. |
| 12 | THE COURT:  Sir, please raise your right hand and be |
| 13 | sworn. |
| 14 | **ERIC BRELSFORD**, |
| 15 | called as a witness on behalf of the Government, having been |
| 16 | first duly sworn, testified as follows: |
| 17 | THE COURT:  Please take the witness stand right here, |
| 18 | and then tell us who you are. |
| 19 | THE WITNESS:  My name is Eric Brelsford, E-r-i-c |
| 20 | B-r-e-l-s-f-o-r-d. |
| 21 | DIRECT EXAMINATION |
| 22 | BY MS. RABENN: |
| 23 | **Q.**  Good morning, Special Agent Brelsford. |
| 24 | **A.**  Good morning. |
| 25 | **Q.**  Where do you work? |

344

1   **A.**   I'm employed as a Special Agent with the FBI.

2   **Q.**   And in what state do you work?

3   **A.**   I'm currently assigned to the Chicago Field Office of the

4   FBI, in Illinois.

5   **Q.**   And how long have you been a Special Agent?

6   **A.**   I have been a Special Agent since 2003.

7   **Q.**   Have you always worked in Chicago as a Special Agent?

8   **A.**   No.  My first office with the FBI was the Milwaukee Field

9   Office, where I was assigned from 2003 to 2006.

10  **Q.**   And what are your job duties?

11  **A.**   I am in Chicago.  My responsibility is to investigate

12  cyber crime, which is primarily focused on computer hacking

13  related investigations.

14          In Milwaukee, my primary responsibility was

15  investigating online exploitation of children.

16  **Q.**   Were you asked to travel here today to testify about a

17  child depicted in an image sent to you as an e-mail attachment

18  a couple weeks ago?

19  **A.**   Yes, I was.

20  **Q.**   I would like to direct your attention to that exhibit

21  binder in front of you.  Could you look at Exhibit 49.  Please

22  review this exhibit until you are familiar with it.

23  **A.**   Yes.

24  **Q.**   Are you able to identify the person depicted in Exhibit

25  49?

ERIC BRELSFORD

1   **A.**   Yes, I am.

2   **Q.**   Without stating it in open court, do you know what that

3   person's name is?

4   **A.**   Yes, I do.

5   **Q.**   Could you generally describe whether it is a boy or girl,

6   adult or child?

7   **A.**   This is a boy who was between approximately eight and nine

8   years of age when this particular -- this image is from a

9   video, when this particular video was created.

10  **Q.**   And have you personally seen this boy before through a

11  prior investigation in which you were involved as a Special

12  Agent?

13  **A.**   Yes, I have.

14  **Q.**   Does the image you are looking at fairly and accurately

15  identify this person?

16  **A.**   Yes, it does.

17          MS. RABENN:   I believe Exhibit 49 is already

18  admitted, so we can publish it to the jury at this time.

19          THE COURT:   True.

20  BY MS. RABENN:

21  **Q.**   I would also like to direct your attention to Exhibit 50

22  in that binder.  Are you able to identify that person depicted

23  in Exhibit 50?

24  **A.**   Yes, I am.

25  **Q.**   Without stating it in open court, do you know what that

1    person's name is?

2    **A.**  Yes, I do.

3    **Q.**  Is it another boy?

4    **A.**  Yes, it is.

5    **Q.**  Have you personally seen this boy before through a prior

6    investigation in which you were involved as a Special Agent?

7    **A.**  Yes, I have.

8    **Q.**  And does the image you are looking at fairly and

9    accurately identify this person?

10   **A.**  Yes, it does.

11        MS. RABENN:  Exhibit 50 is also already admitted, so

12   I would publish it at this time.

13        MR. HUSS:  No objection.

14   BY MS. RABENN:

15   **Q.**  Could you briefly describe the circumstances when you

16   first saw these boys?

17   **A.**  In January of 2004, I was assigned to investigate an

18   individual engaged in the sexual exploitation of children,

19   including the production of images and videos depicting

20   children engaged in sexually explicit activity.

21        Through the course of that investigation, we

22   identified a number of victim children residing in Wisconsin,

23   who were victimized by this particular individual and depicted

24   in images and videos that this individual created.

25        The two victim children depicted in Exhibits 49 and

ERIC BRELSFORD

347

1  50 were two of the children that I met through the course of

2  that investigation.

3  **Q.**  And when, approximately, did you meet them?

4  **A.**  I met both of them in 2004, for the first time.

5  **Q.**  And how did you first meet them?

6  **A.**  I met them in the context of preparing both of them as

7  witnesses for the trial of the individual whom we were

8  investigating at that point in time.

9  **Q.**  Did this investigation that you are referring to lead to

10  the conviction of the adult depicted in the videos from which

11  these photographs were extracted?

12  **A.**  Yes, it did.

13  **Q.**  Of what charges was he convicted?

14  **A.**  He was convicted of charges that included sexual abuse of

15  a child under the age of 12, as well as production of material

16  depicting children engaged in sexually explicit conduct.

17  **Q.**  Special Agent Brelsford, can you tell us approximately

18  when the videos from which these photographs were extracted

19  were made?

20  **A.**  These would have been created between approximately

21  October of 2002 and January of 2004.

22  **Q.**  What is your best estimate regarding how old these boys

23  were when they were recovered in 2004?

24  **A.**  The boy depicted in Exhibit 49 would have been

25  approximately nine to ten years of age when I first met him in

ERIC BRELSFORD - X

348

1    2004.  And the boy depicted in Exhibit 50 would have been
2    approximately between ten and 11 years of age when I first met
3    him in 2004.
4    Q.  Based on your knowledge of this investigation, in what
5    state were these images produced?
6    A.  These images were produced in Wisconsin.
7    Q.  And with these videos being produced no later than 2004,
8    were these boys still minors when these images were created in
9    Wisconsin state?
10   A.  Yes.
11         MS. RABENN:  Thank you.  Subject to
12   cross-examination, I have nothing further at this time.
13         THE COURT:  Cross, please.
14                        CROSS-EXAMINATION
15   BY MR. HUSS:
16   Q.  You said that the person that was responsible was
17   convicted?
18   A.  Yes, he was.
19   Q.  In what state?
20   A.  He was convicted of federal charges in the Eastern
21   District of Wisconsin.
22   Q.  Was this a Caucasian person?
23   A.  Yes.
24   Q.  And so from seeing these pictures, apparently, there were
25   some pictures taken in between 2002 and 2004, and those

1    apparently are still floating around in the Internet?

2    **A.**   Yes.   That's correct.

3    **Q.**   And do you have any ability in your profession to

4    eliminate those from floating around in the Internet?

5    **A.**   Unfortunately, no.

6             MR. HUSS:   Thank you.   No further questions.

7             THE COURT:   Anything else?

8             MS. RABENN:   Nothing, your Honor.

9             THE COURT:   You may step down.   Thank you.

10            THE WITNESS:   Thank you.

11            THE COURT:   Next witness, please.

12            MS. RABENN:   One moment, your Honor.

13       (Counsel conferred off the record.)

14            MS. RICHARDS:   We have no further witnesses at this

15   time.

16            THE COURT:   Government rests?

17            MS. RICHARDS:   Subject to one issue that we should

18   take up outside the presence of the jury.

19            THE COURT:   A legal issue then?

20            MS. RICHARDS:   Yes.

21            THE COURT:   Okay.

22            Ladies and gentlemen, now is a natural break for you.

23   We will continue on because we have some legal issues.   We

24   will also begin other legal issues that counsel is not asking

25   for, but when the government rests, I have certain obligations

1   that I have to do legally, and I will do them.  There is no

2   reason at all, because they are legal issues, for you to have

3   to sit around and wait.

4        So tomorrow morning, I will ask you to be in the jury

5   room, ready to go, at 8:30, and we will continue on with the

6   defense case at that time.

7        And please remember now you have heard a lot of

8   testimony, and it is important that you still not talk about

9   it.  You can't deliberate yet.  And so no investigation, no

10  discussion, and just get some rest.

11       And we will see you tomorrow morning, at 8:30.

12    (The jury left the courtroom.)

13       THE COURT:  Let the record reflect that the jury has

14  left.

15       Your issue?

16       MS. RICHARDS:  Your Honor, we would like to ask for

17  the Court to take judicial notice that Bakersfield is in

18  California.  We could also call another witness to establish

19  that.  We are not sure that we established that with our prior

20  witnesses.

21       THE COURT:  No objection?

22       MR. HUSS:  That we are in California?

23       THE COURT:  No, that Bakersfield is, and it is in the

24  Eastern District of California.

25       MR. HUSS:  I wondered at times, but no, I have no

1  objection.

2          THE COURT:  So there is no issue.

3          MS. RICHARDS:  Okay.  Great.

4          THE COURT:  Anything else?

5          MS. RICHARDS:  No, that's it.

6          THE COURT:  Okay.  Do you want to go through the jury

7  instructions?  Shouldn't take long.

8          MR. HUSS:  I thought that would be a good use of our

9  time, and I need to talk to the prosecutor about some -- one

10  witness issue and some clips, one or more clips.  So I can do

11  that whenever it is convenient.

12          THE COURT:  I don't need to be a part of that, right?

13          MR. HUSS:  No, you don't.

14          THE COURT:  All right.  He could stay.

15          MR. HUSS:  I told him I was going to let him go to

16  dialysis, that he doesn't need to be here for the jury

17  instructions.

18          THE COURT:  It's up to you.  He can be if he wishes.

19  If he wants to waive his presence, he can.  Whatever he wants

20  to do is fine with me.

21          MR. HUSS:  I would like to let him go to the

22  dialysis.

23          Do you want to sit and listen to the jury

24  instructions or go to dialysis?

25          THE DEFENDANT:  What time is it?

352

1          THE COURT:  It is 12:35.  You have plenty of time to

2     sit and listen to the jury instructions, if you want to.

3          MR. HUSS:  I think he is going to go back.

4          THE COURT:  All right.  Mr. Bosby, you understand you

5     have a right to be here during our discussion about the jury

6     instructions?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And my understanding is you don't want to

9     do that.

10          THE DEFENDANT:  I will let him take care of it.

11          THE COURT:  So you are waiving your right to be here

12     during the discussion of the jury instructions; is that what

13     you are telling me?

14          THE DEFENDANT:  Yeah, because I'm assuming I will

15     hear them anyway.

16          THE COURT:  Well, you will, except this is the

17     discussion of whether or not to give them and in what form, so

18     it is substantive.

19          It is up to you.

20      (Counsel and the defendant conferred off the record.)

21          THE DEFENDANT:  I waive it.

22          THE COURT:  You waive it, all right.  Court accepts

23     the knowing, intelligent, and voluntary waiver.

24          Let's start talking.  Why don't we go off the record,

25     see if we have issues, and then go back on the record to

1    establish what issues there are that exist.  All right?

2        (Discussion was had off the record.)

3        THE COURT:  Back on the record then.  We have gone

4    through the instructions.  I don't believe that there are any

5    issues that remain where either side has a concern.

6        We do have the issue of whether the defendant is or

7    is not going to testify.  One of those instructions, either

8    the one entitled, "Defendant's Decision to Testify," or the

9    other, "Defendant's Decision Not to Testify," one of those, of

10   course, will be taken out, but we won't know until tomorrow

11   morning when Mr. Huss lets us know.

12       There is a question about the verdict form.  Mr. Huss

13   is suggesting that perhaps he doesn't want all the detail or

14   doesn't need all the detail.

15       The government is considering that, and counsel are

16   going to meet and confer this afternoon, make a decision on

17   whether, which form they want, and you will provide that to

18   the Court this afternoon.

19       And if there is a agreement, great.  If there is not

20   an agreement, why, I will either rule or give the one the

21   instructions -- excuse me, the verdict forms, in the

22   alternative, of course, that I have.

23       All right?  Everybody good?

24       MR. HUSS:  Yes.

25       MS. RICHARDS:  Yes.

354

1          THE COURT:  Okay.  See you in the morning, at 8:30.

2      (The proceedings were adjourned at 12:44 p.m.)

3          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

4      certify the foregoing transcript as true and correct.

5

6  Dated:  8th of February, 2018      /s/ Peggy J. Crawford
                                       PEGGY J. CRAWFORD, RDR-CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25